**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

RONNIE JERMAINE SHERRORS,

Petitioner,

vs.

A.K. SCRIBNER, Warden,

Respondent.

Civil No.      05-1262 IEG (LSP)

**REPORT AND RECOMMENDATION RE CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS**

I.    **INTRODUCTION**

Ronnie Jemaine Sherrors, a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his San Diego Superior Court conviction in case number SCD148249 for first degree murder with the special circumstance of murder during the course of a robbery.

The Court has considered the Petition and Exhibits, Respondent's Answer, Petitioner's Traverse and all the supporting documents submitted by the parties. Based upon the documents, and for the reasons set forth below, the Court recommends that the Petition be conditionally **GRANTED**.

II.   **FACTUAL BACKGROUND**

The following statement of facts is taken from the California Court of Appeal opinion, *People v. Hall*,[1] No. D038857, slip op. (Cal. Ct. App. July 16, 2003). This Court gives deference

---

[1] Sherrors appeal was consolidated with that of his co-defendant, James Willard Hall.

to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.   28 U.S.C.A. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).   The facts as found by the state appellate court are as follows:

Foth was a songwriter-musician who lived in San Francisco and ran a record store there (Rocket Records). Having grown up in San Diego, Foth had close friends here, including Grace Ko, Steve Poltz and Ken Horne. By the late 1990's, Rocket Records' business began to decline; Foth began to experience financial problems and by 1999 had started using crack cocaine and "hanging around" with prostitutes. (All further dates are in 1999 except as otherwise noted.) After Ko became aware of Foth's problems, she convinced him to come to San Diego for a couple of months to stay with her and try to get his life back in order. In early September, Foth moved into Ko's home in Mission Hills; he was depressed and slept a lot.

On the afternoon of Wednesday, September 29, Ko and Foth drove to the Oceanside home of Louis and Christine Mello. Ko and Christine went shopping; Foth planned to spend time with Louis, visit some other friends and then return to Ko's house to pick up Horne to join Ko and the Mellos for dinner at a Chevy's restaurant in Carmel Mountain Ranch. Ko left the keys to her car, a black Audi A4, and her cell phone with Foth, as well as her Visa card so that Foth could put some gasoline in the car.

Foth visited with Louis until sometime between 1:30 and 2:00 p.m. and then drove to Poltz's apartment. Although Foth professed that he was not using drugs anymore, Poltz declined to give Foth any money because he was unconvinced by Foth's statements, in part because Foth had spent a night away from Ko's home in the first week after his arrival in San Diego and lied to his friends about where he was. Poltz offered, however, to pay for Foth to see a therapist he knew to help Foth deal with his problems. Foth told Poltz that he would think about it, but was antsy because he wanted to "get laid." While Foth was with Poltz, he called a couple of women with whom he had been sexually intimate in the past.  Foth left Poltz's apartment about 5:30 p.m. Foth was wearing faded black Levi's, a black T-shirt, Doc Marten wingtip shoes and a cheap plastic watch.

After Foth arrived back at Ko's house, he spoke on the phone with Horne, saying that he was going to see another friend to borrow some money but would be back. Foth had not returned by the time Horne arrived but had left a note.  At 6:50 p.m. (according to cell phone records), Horne called Ko's cell phone, expecting to reach Ko, but Foth answered and told Horne that he would be back "in a bit." It sounded like Foth was driving at the time. After 15 minutes passed, Horne tried the cell phone again, but got no answer.

Ko and the others waited for Foth to arrive at Chevy's and, by 7:00 p.m., she became concerned about where Foth was. Ko called her cell phone number every 10 minutes or so for the rest of the evening but only got the voice mail. Someone unsuccessfully attempted to use Foth's ATM card at 8:56 p.m. and someone used Ko's cell phone [at 11:46 p.m.]to call a pager owned by Michael Washington, a friend of Sherrors's and

1    Hall's.

2         In the late afternoon of September 30, a worker at the Pinery Tree Farms discovered Foth's naked body in a brushy area near a work site on Highland
3    Valley Road and pointed it out to his manager, Laurence Prindle. Although Prindle had come by the site several times that day, he had not seen the body
4    earlier. Prindle called 911. Responding officers determined that Foth was dead and found a number of items at the scene, including a shirt, a pair of size eight
5    sneakers, a Seiko wristwatch with a metal face, a broken fingernail and a pair of bloodstained white socks. They also found a circular bloodstain, one foot in
6    diameter and two inches deep, near the fence and marks on the ground leading from the stain to the place where they found Foth's body, suggesting that the body
7    had been dragged. They also found a shoe print in the soil.

8         An autopsy showed that Foth, who was six feet, one-half inch tall and weighed 183 pounds, had bled to death. The body had approximately 83 stab
9    wounds, many of which were in the upper chest and neck area, as well as abrasions on the back, defensive wounds to the right hand and wrist and a blunt
10   force trauma to the head. It also had streaks of seminal fluid across the right thigh, an occurrence that is not unusual for a male homicide victim and that did not
11   necessarily indicate the victim had been engaged in sex. The body tested negative for the presence of drugs.

12
13        On October 9, Lena Hixon told her close friend, Eric Bazile, that she had witnessed "something . . . pretty bad" and that two guys had threatened her life.
14   Bazile and his friend Shahyid told Hixon to call the police. Hixon refused, so Shahyid made the call. Hixon left Bazile's apartment and Shahyid followed her.
15   The two argued, attracting the attention of the police, and Shahyid told the officers what Hixon had said. The officers arrested Hixon, who was carrying a razor blade.

16        Hixon falsely told police that she had committed this crime with two men named Benjamin Wilson and Terrence Smallgreen and that Smallgreen had lost
17   his watch and left his shirt at the scene. A few days later, Hixon told Bazile that Sherrors and Hall were involved in the murder and asked Bazile to notify the
18   police. Hixon repeated her statements in her subsequent police interview.

19        At trial of the charges against Sherrors and Hall, Hixon testified as follows:

20        In the late afternoon or early evening of September 29, Foth approached Hixon near University and Euclid Avenues and asked if she knew where to buy
21   some rock cocaine. Although Hixon initially hesitated because she suspected that Foth was an undercover agent, she ultimately told him she knew where to get
22   some; they drove in Ko's Audi to an apartment on Wightman Street, where Sherrors and Hall were living. At the time, Sherrors, Hall and Hixon were
23   handling drug sales for Hixon's boyfriend, Michael Washington.

24        When Hixon whistled loudly, Hall and Sherrors came out of the apartment. Hixon told Sherrors that Foth was looking for cocaine and Sherrors spoke briefly
25   to Foth, who was still sitting in the car. Sherrors and Hall got into the vehicle with Foth. Sherrors told Hixon they would be right back and the three men drove off.

26
27        After 15 to 20 minutes, Sherrors drove up in the Audi with Hall sitting in the back seat; Foth did not appear to be with them. Sherrors and Hall told Hixon
28   that they had "hooked [Foth] up" and he was letting them use the car in exchange for drugs, a practice that is not uncommon for drug dealers. Sherrors told Hixon
     to get in the car to go smoke some "weed" and Hixon complied.

Sherrors initially had difficulty driving with the car's stick shift but seemed to have it figured out by the time he got onto the I 15 freeway. After awhile, Hixon became concerned because it was unusual for a dealer to keep a customer's car for that period of time; Sherrors responded by explaining that he and Hall had robbed Foth, but Hixon thought he was kidding.

They continued to drive north until they neared Lake Hodges and exited the freeway onto a dark street. Sherrors parked the car in a dirt lot, told Hixon to stay there and said he and Hall would be right back. The men opened the trunk and Foth climbed out. Foth was clothed, but he was holding his hands as if they were tied. Hixon got out of the car and demanded to know what was happening; Sherrors grabbed her hands, breaking two of her acrylic fingernails. Sherrors told Hixon to "shut the f--- up" and threatened to kill her and everybody she knew.

Sherrors turned back toward Hall and Foth, who were tussling, and started to stab Foth. Foth did not appear to put up a fight but merely said, "Let me die." Sherrors continued to stab Foth for several minutes and then walked back to Hixon with the knife and told her to stab Foth. Hixon initially refused, but stabbed Foth once after Sherrors insisted they were not going to just let her walk away; according to her testimony, Hixon believed that Foth was already dead. Sherrors and Hall stripped Foth and threw his body into the bushes. Hall put Foth's clothes into the trunk and Sherrors, Hall and Hixon got into the Audi. Sherrors was wearing a different shirt than he had had on earlier.

With Sherrors at the wheel, the threesome got back onto the freeway and headed southbound. At some point, Sherrors muttered that he had dropped his watch at the scene. They drove for about five or 10 minutes and got off the freeway to stop at an AM PM convenience store/gas station. Hall purchased some cigarettes at the store and attempted unsuccessfully to use Foth's ATM card. (Although Hall had used the correct PIN number for Foth's account, the bank had "frozen" the account six days earlier.) Sherrors and Hall dropped Hixon off at a liquor store at University and Euclid Avenues. Sherrors held up a picture of Hixon's five-year-old daughter and said, "She's growing up to be real pretty. I think you'd like to keep it that way."

In addition to Hixon's testimony, the prosecution introduced evidence of the following:

Sherrors eventually returned to the Wightman Avenue apartment, wearing his sister's "old laundry shirt" inside out and backwards. There were blood marks on the front side of the shirt (as worn normally) and a significant amount of blood on Sherrors's white Fila tennis shoes. Sherrors later left the apartment with a bag and, when asked where he was going, responded, "Don't worry about it." He was wearing gray Nike shoes at the time. Sherrors's sister never saw her shirt again.

Shortly after Sherrors left the apartment, a neighbor called the fire department because her downstairs unit at the same complex was filled with smoke that smelled of burnt plastic. She directed the responding firefighters to the complex's dumpster area, where they found a smoldering pile of debris. The firefighters stomped out the remains of the fire.

Sherrors and Hall kept the car for several days, claiming it belonged to Hixon's mother. On October 2, the men saw a newscast regarding the murder that mentioned the car and, early the next morning, the car burned in a fire as it sat in a nearby alley. After the fire was extinguished, police inspected the car, but did

not find any of the defendants' fingerprints on the car exterior or any detectable bloodstains in the trunk.

On October 14, police searched the Wightman apartment and arrested Sherrors, Hall and Jimmie Washington.  They took saliva, blood and other samples from Sherrors, Hall and Jimmie.  They found Foth's high school class ring in a pair of Hall's pants and found Michael Washington's pager number in Sherrors's pocket.  They ultimately re-arrested Hixon, who was charged with Sherrors and Hall for Foth's murder.

While Hixon was being held at the Los Colinas Women's Detention Center, she spoke several times to inmate Kathrine Davis about the incident. Hixon told Davis that she had approached Foth to see if he wanted her services as a prostitute and that she, Sherrors and Hall had robbed Foth and killed him. Hixon also told Davis that although she did not initially realize that Foth was in the trunk of the Audi, she found that out as the three were driving north.  She indicated to Davis that she stabbed Foth several times and held him down as Sherrors and Hall stabbed him. Hixon said that "her old man" had destroyed the shoes she wore on the night of Foth's murder and that her clothes from that night were burned in the car.  Hixon was hesitant to testify against Hall, who was an old friend, and she was also concerned about her safety as a result of threats Sherrors had made against her.

In November, Michael Washington stored some items at the house of Mikiisha Perine.  Several months' later, when Perine was preparing to move, she looked through the items and found a blue purse containing Hixon's social security card, Ko's Visa and Costco cards, Foth's ATM card and three of Foth's business cards.  Perine called Ko, who alerted the police.

Hixon entered into a plea agreement with prosecutors in which she agreed to plead guilty to conspiracy to sell cocaine and assault with a deadly weapon and to testify truthfully in these criminal proceedings against Sherrors and Hall.  In accordance with the agreement, the court sentenced Hixon to 12 years in prison.

Counsel for Sherrors and Hall responded to the prosecution's evidence by attacking Hixon's credibility through evidence that she was a prostitute and drug user, had changed her story about the events of the evening in question, had made statements to Kathrine Davis indicating that she had significant involvement in the murder, had lied in saying that she never used Ko's cell phone and had not been in the Audi at all after Sherrors and Hall dropped her off.  Defense counsel also argued that it was not possible for the events of September 29 to have happened as Hixon testified.

(Resp't Lodgment 4 at 2-10.)

## III.   PROCEDURAL BACKGROUND

On June 7, 2000, the District Attorney for the County of San Diego filed an Amended Information charging Ronnie Sherrors with one count of murder (Cal. Penal Code § 187(a)), and further alleged the use of a deadly weapon (Cal. Penal Code §12022(b)(1)) and a special circumstance of murder during the commission of a robbery (Cal. Penal Code § 190.2(a)(17)).

1   (Resp't Lodgment No. 15 at 66-70.)

2       On June 7, 2001, a jury found Sherrors guilty of murder in the first degree and found true

3   the deadly weapon allegation as well as the murder during commission of a robbery special

4   circumstance.  (Resp't Lodgment No. 15 at 299-300.)  On September 28, 2001, the trial court

5   sentenced Sherrors to life without the possibility of parole, plus one year.  (Resp't Lodgment No.

6   15 at 329-330.)

7       Sherrors appealed to the California Court of Appeal, Fourth Appellate District, Division

8   One.  (*See* Resp't Lodgment No. 1.)  On July 16, 2003, the appellate court affirmed Sherrors'

9   conviction in an unpublished decision.  (Resp't Lodgment No. 4.)  On August 15, 2003, Sherrors

10  filed a petition for review in the California Supreme Court.  (Resp't Lodgment No. 5)  The court

11  denied the petition without comment on October 1, 2003.  (Resp't Lodgment No. 6.)

12      On October 25, 2004, Sherrors filed a petition for habeas corpus in the San Diego

13  Superior Court, raising fifteen claims.  (Resp't Lodgment No. 9.)  The court denied the petition

14  in a reasoned decision on December 9, 2007.  (Resp't Lodgment No. 10.)  Sherrors then filed

15  a sixteen-claim petition for habeas corpus with the California Court of Appeal, which was denied

16  on February 24, 2005.  (Resp't Lodgment Nos. 11 & 12.)  Finally, Sherrors filed a seventeen-

17  claim habeas petition with the California Supreme Court on March 28, 2005, which was denied

18  on March 15, 2006.  (Reps't Lodgment Nos. 13 & 14.)

19      Sherrors filed the instant Petition in this Court on June 20, 2005 [Doc. No. 1].

20  Respondent filed a motion to dismiss the petition on September 12, 2005 [Doc. No. 8].  The

21  Court denied the motion on March 23, 2006.  Respondent filed an Answer [Doc. No. 29], and

22  Petitioner filed his Traverse on October 25, 2006 [Doc. No. 42].

23  **IV.   DISCUSSION**

24      **A.   Scope of Review**

25      Title 28, United States Code, § 2254(a), sets forth the following scope of review for

26  federal habeas corpus claims:

27          The Supreme Court, a Justice thereof, a circuit judge, or a district court
            shall entertain an application for a writ of habeas corpus in behalf of a person in
28          custody pursuant to the judgment of a State court only on the ground that he is in
            custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C.A. § 2254(a) (West 1994) (emphasis added).

The current petition is governed by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West Supp. 2004) (emphasis added).

To obtain federal habeas relief, Sherrors must satisfy either § 2254(d)(1) or § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13; *see Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus

claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*

**B.    Analysis**

Sherrors raises fourteen grounds for relief in his petition, some of which contain two or even three distinct federal claims: (1) his federal due process rights were violated when the trial court instructed the jury that witness Hixon was an accomplice and there was no other evidence presented to corroborate her testimony and he was denied effective assistance of appellate counsel when counsel failed to raise this claim on appeal; (2) his right to due process was violated when the trial court failed to instruct the jury that Hixon's plea agreement did not exempt her from the corroboration requirement and trial counsel and appellate counsel were ineffective for failing to object at trial and raise the claim on appeal; (3) his right to due process and to confront witnesses against him was violated when the trial court precluded evidence related to witness Walker's mental capacity and propensity to be dishonest, he also claims his counsel was ineffective for failing to cite to the appropriate Constitutional provisions during the hearing regarding Walker's testimony, failing to acquire additional records regarding Walker's mental capacities and an expert examination of Walker and failing to argue that Walker waived her privilege; (4) his right to due process and an impartial jury were violated by pre-trial publicity, racial and class bias, and his trial counsel was ineffective for failing to adequately voir dire prospective jurors; (5) his right to due process was violated when the state tested a cigarette butt for DNA and in the process consumed the entire sample, leaving nothing for a defense expert to test independently, and his trial counsel was ineffective for failing to move for dismissal as a result; (6) his rights to due process and effective assistance of counsel were violated when the court found Walker competent to testify and counsel failed to adequately challenge her competency; (7) his rights to due process and effective assistance of counsel were violated when the court erroneously instructed the jury as to the special circumstance allegation and counsel failed to object; (8) his rights to due process, a jury trial and effective assistance of counsel were violated when the jury was given defective verdict forms and counsel failed to seek

correction of the forms; (9); his rights to due process and effective assistance of counsel were violated when the court erroneously instructed the jury and counsel failed to seek curative instruction (10)  his due process rights were violated when he was convicted without sufficient evidence; (11) his due process rights were violated when the prosecutor committed misconduct during closing argument; (12) his right to due process was violated by the introduction of perjurious testimony; (13) his rights to due process and effective assistance of counsel were violated when the police and prosecutor coerced witness Lena Hixon into giving false testimony; (14) his right to due process was violated when the prosecution failed to discover and turn over records concerning witness Trina Walker's disability and therapy.  (*See* Pet. at 9A-9F.)

The court will address each ground for relief as Sherrors raised it and address each individual claim included therein.  However, because many of the grounds for relief are similar or overlap, the Court has grouped similar grounds together.

### 1.    *Claims Regarding Witness Lena Hixon's Testimony*

Sherrors argues that several errors occurred related to the testimony of Lena Hixon, the prosecution's principle witness.  Hixon was originally charged, along with Sherrors and Hall, with first degree murder with special circumstances. (Resp't Lodgment No. 17, vol. 7 at 906-08, 909-10.)  However, after her preliminary hearing, she agreed to assist the prosecution and entered into a plea agreement.   In exchange for her testimony against Sherrors and Hall, she would plead guilty to conspiracy to sell cocaine (Cal. Penal Code § 182) and assault with a deadly weapon (Cal. Penal Code § 245(a)(1)) and receive a sentence of twelve years' imprisonment. *(*Resp't Lodgment No. 17 at 912-13.)  Under the terms of the agreement, if Hixon did not testify truthfully, she could be prosecuted for first degree murder and also prosecuted for perjury.  (*Id.* at 911.)

Five of Sherrors' grounds for relief stem from alleged errors regarding Hixon's testimony.  More than one constitutional claim is raised in a single ground for relief.  (*See* Pet. at 9A-9F.)

### a.    **Ground One**:

Sherrors first argues the jury was improperly instructed that Lena Hixon was an accomplice as a matter of law and  the other evidence presented at trial failed to corroborate her

testimony.  Sherrors alleges this amounted to a violation of both Cal. Penal Code § 1111[2] and his federal due process rights.  He also claims his appellate counsel was ineffective for failing to raise this claim on appeal.  (Pet. at 9A.)

*(1)     Due Process*

Sherrors raised the due process claim in a petition for review of a habeas corpus filed in the California Supreme Court, which denied it without citation of authority.  (*See* Lodgment No. 14.)  Thus, this Court must "look through" to the last reasoned state court decision to address the claim, the superior court opinion denying his habeas corpus petition, as the basis of its analysis.  *Ylst*, 501 U.S. at 801-06.  The superior court denied the claim, stating there was no violation of section 1111 because "it is clear from the appellate decision that there was ample evidence connecting Petitioner to the murder beyond Hixon's testimony."  (Resp't Lodgment No. 10 at 2.)

The state court's denial of Sherror's claim was neither contrary to, nor an unreasonable application of, clearly established law.  Although the state court did not discuss the federal aspect of Sherror's claim, the Supreme Court has noted a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  *Early*, 537 U.S. at 8.  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law.  *Id.*

First, Sherrors' claim is without merit because there is no clearly established federal law requiring the standard set forth in Cal. Penal Code § 1111 be met.  "As a statutory rule, and to the extent that the uncorroborated testimony is not 'incredible or insubstantial on its face,' [Cal. Penal Code § 1111] is not required by the Constitution or federal law."  *Laboa v. Calderon*, 224

---

[2]  Cal. Penal Code § 1111 states:

A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.

1    F.3d 972, 979 (9th Cir. 2000) (quoting *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th

2    Cir. 1993).

3    　　　Thus, clearly established law requires only that the testimony be not be "incredible or

4    insubstantial on its face." *Laboa*, 224 F.3d at 979.)  Here, as the state court found, Hixon's

5    testimony was not incredible or insubstantial.  Further, there was ample evidence to corroborate

6    her testimony.  Trina Walker testified that when Sherrors returned that night, he was wearing one

7    of her "laundry" shirts, backward and inside out.  She stated that she saw blood on Sherrors'

8    shoes and shirt when he returned home on the night of the murder.[3]  (*Id.* at 1347-1349, 1371-72,

9    1372-74.)  Walker also identified a watch found at the crime scene as Sherrors.  (*Id.* at 1342-44.)

10   She also stated that she saw Sherrors leave with a bag soon after he came home and changed out

11   of his clothes.  (*Id.* at 1352).  Moments later, there was a fire near the dumpster.  (*Id.* at 1352,

12   382-85, 366-71, 374-75.)  In addition, at least one witness saw Sherrors and Hall driving the

13   Audi in the days after the murder (*Id.* at 890-83.)  Several witnesses also had seen the Audi

14   parked in the alley behind the apartment in which Hall and Sherrors' were staying. (*Id.*  at 750-

15   52, 752-54, 754, 57.)  The Audi was ultimately set on fire in an alley very close to the apartment

16   where the two defendants were staying.  Finally, a phone number written on Sherrors' Social

17   Security card was called at 11:46 p.m. on the night of the murder by someone using Ko's stolen

18   cell phone. (*Id.* at 1247-58, 1284, 1405-07.)  This call was made right around the time Sherrors

19   had returned to the apartment wearing the bloody shirt and shoes and then left holding a bag.

20   Shortly after, the dumpster fire was called in at 11:47 p.m.  (*Id.* at 378-79.)

21   　　　Other evidence introduced by the defense also corroborated her testimony.  Katherine

22   Davis was a fellow inmate of Hixon's.  Although much of Davis' testimony was related to

23   discrepancies between what Hixon told Davis and what Hixon told the police, other portions of

24   Davis' testimony corroborated Hixon.  For instance, Hixon consistently told Davis that she

25   (Hixon), Sherrors and Hall had all participated in the murder.  (*Id.* at 1629-34.)  Davis also

26   _____

27   　　　[3] Another witness, seven-year-old Douglas Griffey (who was five at the time of the murder) also
     testified to seeing blood on Sherrors' shirt and shoes. (Resp't Lodgment No. 17 at 876-78.)  However,

28   Douglas also testified to witnessing patently fantastical things that night.  For instance, he testified that
     he witnessed the victim being murdered and dismembered  in the back of the alley by men wielding
     ninja swords and seeing a car being blown up by a bomb.  (*Id.* at 878-85.)

1   testified that Hixon told her that she had lost a fingernail at the murder scene and that Foth had

2   asked Hixon if she knew where he could get some crack cocaine.  (*Id.* at 1611, 1635.)

3        Thus, in light of the above, it was reasonable for the state court to find there was ample

4   evidence, beyond that of Lena Hixon's testimony, to satisfy California Penal Code section 1111.

5   Any uncorroborated testimony was not incredible or insubstantial on its face.  *See Laboa*, 224

6   F.3d at 979.  Thus, the state court's decision was neither contrary to, nor an unreasonable

7   application of, clearly established law.

8        Further, to the extent Sherrors is attempting to establish a due process violation, because

9   the state "arbitrarily deprive[d] [him] of a state law entitlement, Sherrors' claim fails.  *See*

10   *Laboa*, 224 F.3d 979; *see also Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).  Here, as the state

11   court found, (and discussed above) there was no violation Penal Code § 1111 because there was

12   ample evidence corroborating Hixon's testimony.  (*See* Resp't Lodgment No. 10 at 2.)  Thus,

13   Sherrors was not "arbitrarily" denied a state law entitlement.  Accordingly, he was not denied

14   due process and the state court's denial of his claim was neither contrary, nor an unreasonable

15   application of clearly established law.

16                  *(2)    Ineffective Assistance of Appellate Counsel*

17        Sherrors argues next that he received ineffective assistance of appellate counsel because

18   counsel did not raise the above due process issue on appeal.  (Pet. at 9A.)  Sherrors raised this

19   issue in his state habeas petition to the California Supreme Court and it was denied without

20   comment. Thus, this Court must "look through" to the last reasoned state court decision to

21   address the claim, the superior court opinion denying his habeas corpus petition, as the basis of

22   its analysis. *Ylst*, 501 U.S. at 801-06. That court rejected Sherrors' ineffective appellate counsel

23   claim, concluding that he could not satisfy either prong set forth in *Strickland v. Washington*,

24   466 U.S. 668, 688 (1984) (See Resp't Lodgment No. 10 at 2.)

25        It is clearly established that "[t]he proper standard for evaluating [a] claim that appellate

26   counsel was ineffective . . .  is that enunciated in *Strickland*."  *Smith v. Robbins*, 528 U.S. 259,

27   285 (2000) (citing *Smith v. Murray*, 477 U.S. 527, 535-36 (1986)).  A petitioner must first show

28   that his appellate counsel's performance fell below an objective standard of reasonableness.

*Strickland*, 466 U.S. at 688.   He must then establish he was prejudiced by counsel's errors.  *Id.* at 694.   To establish prejudice, Sherrors must demonstrate that he would have prevailed on appeal absent counsel's errors.  *Smith*, 528 U.S. at 285.

The Ninth Circuit has observed that:

> [Strickland's] two prongs partially overlap when evaluating the performance of appellate counsel. In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason-because she declined to raise a weak issue.

*Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir.1989).

Such is the case here. First, Sherrors' appellate counsel was not unreasonable in declining to raise this issue on appeal because it lacked merit.  Under state law, the accomplice instruction was required.  And, as the state court found, there was sufficient corroborating evidence to satisfy Penal Code section 1111.  Thus appellate counsel's performance did not fall below an objective level of reasonableness.  *See Strickland*, 466 U.S. 688.  Second, because there was no error, Sherrors would not have prevailed on appeal and therefore he cannot show prejudice.  *Id.* at 694; *Miller*, 882 F.2d at 1434.  Accordingly, the state court's opinion denying this claim was neither contrary to, nor an unreasonable application of, clearly established law.

(3)     Conclusion

For the above reasons, the Court finds the state court's decisions on the claims raised in Ground One were neither contrary to, nor an unreasonable application of, clearly established law.  Therefore, the Court recommends both claims raised in Ground One be denied.  *See Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254.

**b.     Ground Two:**

Sherrors further claims that his due process rights were violated when the trial court failed to instruct the jury that Hixon's plea agreement did not exempt her testimony from the corroboration requirement and with the instruction to view accomplice testimony with caution.  He alleges also that this amounted to a deprivation of state created liberty interest.  Finally, he

-13-

1  argues that trial counsel was ineffective in failing to request such and instruction and appellate

2  counsel was ineffective in failing to raise these issues on appeal.  (Pet. at 9A.)

3                              *(1)     Due Process*

4            Sherrors concedes that the jury was instructed that if Hixon was subject to prosecution

5  as an accomplice, then her testimony had to be corroborated and viewed with caution.  Sherrors

6  argues that, because Hixon pleaded guilty to lesser charges pursuant a plea agreement, the jurors

7  might have been confused about whether she was an "accomplice."  He suggests the trial court

8  should have specifically instructed the jury that the plea agreement did not exempt Hixon from

9  being deemed an accomplice as a matter of law and thus subject to precautionary instructions.

10  He suggests that without such clarification, the jury might not have applied the accomplice

11  instructions appropriately to Hixon's testimony.  (*See* Pet. at 9A.)

12           Sherrors raised this claim in his habeas petition to the California Supreme Court and it

13  was denied without comment or citation   Thus, this Court must "look through" to the last

14  reasoned state court decision to address the claim, the superior court opinion denying his habeas

15  corpus petition, as the basis of its analysis.  *Ylst*, 501 U.S. at 801-06.   That court denied the

16  claim, concluding that the trial court did, in fact, instruct the jury properly as to the need for

17  corroborating evidence. (Resp't Lodgment 10 at 4.)

18           To the extent Petitioner claims the jury instructions were incorrect under state law, his

19  claim is not cognizable on federal habeas review.  *Estelle v. McGuire*, 502 U.S. 62, 71-72

20  (1991).   To merit relief, clearly established law provides that a petitioner must show the

21  instructional error so infected the entire trial that the resulting conviction violated due process.

22  *Id.* at 72; *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Cupp v. Naughten*, 414 U.S. 141, 147

23  (1973).  The allegedly erroneous instruction must be considered in the context of the trial record

24  and the instructions as a whole.  *Estelle*, 502 U.S. at 72; *Kibbe*, 431 U.S. at 156; *Cupp*, 414 U.S.

25  at 146-47.  The instructions must be more than just erroneous, Sherrors must show that there was

26  a reasonable likelihood that in light of the instructions as a whole, the jury applied the challenged

27  instruction in such a way that his constitutional rights were violated.  *See Carriger v. Lewis*, 971

28  F.2d 329, 334 (9th Cir. 1992) (en banc).

There is no likelihood that the instructions rendered Sherrors's trial fundamentally unfair.  First, there was no error.  The court instructed the jury under CALJIC No. 3.16, that Lena Hixon was an accomplice as a matter of law.[4]  Accordingly, the trial court instructed the jury that Hixon's testimony should be viewed with caution (CALJIC No. 3.18)[5] and as such, that her testimony needed to be corroborated.  (CALJIC Nos. 13.11 & 13.12)[6].  Additionally, the jury

---

[4]  CALJIC No. 3.16, as read to the jury, states: "If the crime of murder was committed by anyone, the witness Lena Hixon was an accomplice as a matter of law and her testimony is subject to the rule requiring corroboration."  (Resp't Lodgment No. 15, vol. 2 at 255.)

[5]  CALJIC No. 3.18 states:

> To the extent that an accomplice gives testimony that tends to incriminate a defendant, it should be viewed with caution.  This does not mean, however, that you may arbitrarily disregard that testimony.  You should give that testimony the weight it deserves after examining it with care and caution in the light of all the evidence in this case.

(Resp't Lodgment No 15, vol. 2 at 256.)

[6] CALJIC No. 3.11 states:

> You cannot find the defendant guilty based upon the testimony of an accomplice unless that testimony is corroborated by other evidence which tends to connect that defendant with the commission of the offense.  Testimony of an accomplice includes any out-of-court statement purportedly made by an accomplice received for the purposes of proving what the accomplice stated out-of-court was true.

(Resp't Lodgment No. 15, vol. 2 at 253.)

CALJIC No. 3.12 states:

> To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the crime which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the crime charged.

> However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the crime charged, or that it corroborate every fact to which the accomplice testifies.

> In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case.  You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime.

> If there is no independent evidence which tends to connect defendant with the commission of the crime, the testimony of the accomplice is not corroborated.

> If there is independent evidence which you believe, then the testimony of the accomplice is corroborated.

was instructed to view all instructions as a whole (CALJIC No. 1.01). (Resp't Lodgment 15, vol. 2 at 222.) Courts presume that jurors follow the instructions given. *See Francis v. Franklin*, 471 U.S. 307, 324 n. 9 (1985); *Hovey v. Ayers*, 458 F.3d 892, 913 (2006). Therefore, in light of all the instructions given the jury regarding Hixon's accomplice testimony, there was no error in declining to instruct the jury that Hixon's plea agreement did not affect her status as an accomplice.[7]

Further, even if the court should have instructed the jury that her plea agreement had no affect on her accomplice status, Sherrors cannot show how failure to do so could have rendered his trial fundamentally unfair. Viewing the instructions discussed above as a whole, there is no likelihood the jury would have been confused about whether Hixon was covered by the accomplice instructions, regardless of whether she had a plea agreement. Her name was inserted in the instruction regarding the definition of accomplice. (Resp't Lodgment No. 15 at 255.) In addition to having the instructions read to them, both the prosecutor and defense counsel made it clear during closing arguments that Hixon was an accomplice and thus her testimony required corroboration and should be viewed with caution. *See States v. Bosch*, 914 F.2d 1239, 1248 (9th Cir.1990) (noting significance of counsel argument when combined with general instruction). The prosecutor stated:

> Lena Hixon is an accomplice. Lena Hixon was actually at the scene and told you

(Resp't Lodgment No. 15, vol. 2 at 254.)

[7] It is also notable that the judge even discussed the need for corroboration of accomplice testimony when questioning the entire jury venire to be sure that prospective jurors would be willing and able to abide by such an instruction. The court stated, in part,

> "I anticipate that something else is going to up into play in this case, and that's the subject of an accomplice and the legal requirement of corroboration of an accomplice.

> . . .You cannot find a defendant guilty based upon the testimony of an accomplice unless that testimony is corroborated by other evidence that tends to connect such defendant with such crime. In other words, there has to be some evidence independent of the testimony of the accomplice that connects [the defendant] to the . . . alleged crimes. . . charged. Is there anybody who would hesitate or be reluctant to apply these instructions to evidence that may arise during the course of the trial. . . .[in addition] the jury is asked to look seriously at the credibility of that witness.. . ..At this time is there any reason why any of you wouldn't undertake that task?"

(Resp't Lodgment No. 15 at 29.)

1   what happened at the crime scene.  Now the law says when you have testimony
    from an accomplice, this type of testimony falls in a particular area of law.  In fact,
2   it means that you have to have some corroboration of an accomplice's testimony.
    In other words, you can't find someone guilty based solely on the testimony of an
3   accomplice.

4   (Resp't Lodgment No. 17, vol. 11 at 1728)

5        Defense counsel reiterated the point:

6        Now, the prosecutor talked to you about the accomplice line of jury instructions.
         I'm going to spend about two minutes on that.  What that means is that the law
7        recognizes the danger of using somebody who is involved in a crime to testify
         against others allegedly involved in a crime.  And the law recognizes there's so
8        much danger there, because an accomplice could testify just to save their own skin
         and lie, that the law requires that the testimony be corroborated in some fashion.

9

10  (*Id.* at 1790.)

11       Thus, there no reason to believe that the jury did not properly apply the instructions

12  regarding Hixon's accomplice testimony.  (Resp't Lodgment No. 15 at 255.)  *See Estelle*, 502

13  U.S. at 72;  *Carriger*, 971 F.2d at 334.

14       Finally, to the extent Sherrors argues that he was deprived of a state created liberty

15  interest, that argument fails for the same reasons discussed above in Ground One.  To establish

16  a due process violation, Sherrors must show that the state "arbitrarily depriv[ed] [him] of a state

17  law entitlement."  *Laboa*, 224 F.3d 979; *see also Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

18  Here, as the state court found, there was no violation Penal Code § 1111 because there was

19  ample evidence corroborating Hixon's testimony.  (*See* Resp't Lodgment No. 10 at 2.)  Thus,

20  there was no violation of section 1111 and as such Sherrors was not "arbitrarily" denied a state

21  law entitlement.  Accordingly, Sherrors due process rights were not violated.

22              *(2)     Ineffective Assistance of Trial Counsel*

23       Next, Sherrors argues trial counsel was ineffective in failing to request a special

24  instruction that would have made it clear to the jurors that Hixon's testimony was subject to the

25  corroboration and cautionary requirements.

26       Sherrors rasied this claim in a state habeas petition to the California Supreme Court which

27  denied the claim without comment or citation.  Thus, this Court must "look through" to the last

28  reasoned state court decision to address the claim.  *Ylst*, 501 U.S. at 801-06. However, the

1  superior court opinion did not discuss Sherrors' ineffective assistance of counsel claim.

2  Therefore, this Court reviews the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th

3  Cir. 2002).

4      As discussed above, clearly established Supreme Court law regarding ineffective

5  assistance of counsel claims is *Strickland*, 466 U.S. 668, 688. *Strickland* requires a two-part

6  showing. First, an attorney's representation must have fallen below an objective standard of

7  reasonableness. *Id.* at 688. Second, a defendant must have been prejudiced by counsel's errors.

8  *Id.* at 694. Prejudice can be demonstrated by a showing that "there is a reasonable probability

9  that, but for counsel's unprofessional errors, the result of the proceeding would have been

10  different. A reasonable probability is a probability sufficient to undermine confidence in the

11  outcome." *Id.*; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993). The Ninth Circuit has

12  held that failure to file a motion will not constitute ineffective assistance of counsel unless the

13  trial court would have granted the motion. *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999).

14      Here, defense counsel's failure to request such an instruction was not unreasonable

15  because it would have merely been redundant of the instructions already given to the jury,

16  namely that Hixon was an accomplice (CALJIC No. 3.16), her testimony should be viewed with

17  caution (CALJIC No. 3.18), and her testimony required corroboration (CALJIC Nos. 3.11 &

18  3.12.). (Resp't Lodgment No. 15, vol. 2 at 253-56.) In addition, the court instructed the jury on

19  how it may evaluate the believability of a witness, stating, in part, that the jury was free to

20  consider whether the witness was testifying under a grant of immunity in assigning what weight

21  it would give that individual's testimony. (CALJIC No. 2.20) (Resp't Lodgment No. 15 at 234.)

22  A second, superfluous, instruction that Hixon was an accomplice despite her plea deal was

23  unneeded and could likely have confused the jury. Accordingly, defense counsel's performance

24  did not fall below the objective standard of reasonableness. *Strickland*, 466 U.S. 688.

25      Moreover, counsel's failure to request the instruction was not prejudicial because the jury

26  was properly instructed that her testimony need to be corroborated and should be viewed with

27  caution. No further instruction was necessary and any request by defense counsel for further

28  instruction would have almost certainly been denied. The jury instructions combined with

reference to them by both counsel is more than sufficient to satisfy due process. *See States v. Bosch*, 914 F.2d 1239, 1248 (9th Cir.1990) (noting significance of counsel argument when combined with general instruction). Thus, there is no reasonable probability that, if the instruction Sherrors suggests would have been given, the outcome of the proceedings would have been affected. *See Strickland*, 466 U.S. 694.

Accordingly, Sherrors fails to satisfy either prong of *Strickland* and therefore the state court's denial of Sherrors' ineffective assistance of trial counsel claim was neither contrary to, nor and unreasonable application of clearly established law. *See Strickland*, 466 U.S. 688, 692.

### *(3)   Ineffective Assistance of Appellate Counsel*

Sherrors argues next that he received ineffective assistance of appellate counsel because counsel did not raise this issue on appeal. Sherrors raised this issue in his state habeas petition to the California Supreme Court and it was denied without comment. Thus, this Court must "look through" to the last reasoned state court decision to address the claim, the superior court opinion denying his habeas corpus petition, as the basis of its analysis. *Ylst*, 501 U.S. at 801-06. That court rejected Sherrors' ineffective appellate counsel claim, stating that "the failure of this claim on the merits is fatal to . . . [Sherrors'] claim that his appellate attorney was ineffective. (See Resp't Lodgment No. 10 at 4.)

The state court's decision is a reasonable application of clearly established law. *See Strickland* 466 U.S. at 688. As discussed above in section C(1)(b)(*1*) Sherrors' due process claim on failure to instruct the jury that Hixon's plea agreement did not affect her status as an accomplice, lacks merit. Therefore, it was not unreasonable for appellate counsel fail to raise it on appeal. *See Strickland*, 466 U.S. 688. Likewise, and it was not prejudicial because the claim would have been denied. *See Miller*, 882 F.2d at 1434. Thus, Sherrors is not entitled to relief on this claim.

### *(4)   Conclusion*

For the above reasons, the Court finds the state court's decisions on the claims raised in Ground Two were neither contrary to, nor an unreasonable application of, clearly established law. Therefore, the Court recommends all three claims raised in Ground Two be denied. *See*

1   *Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254.

2          **c.      Ground Ten:**

3        In Ground Ten, Sherrors argues his due process rights were violated because conviction

4   was based on insufficient evidence.  He argues that he was convicted "almost solely on the

5   testimony of [Hixon].  He argues that her testimony was "proven impossible by the timeframe

6   established by other evidence" and that Hixon was "a proven, repeated liar." In addition, he

7   argues that the testimony that the watch found at the crime scene belonged to him and the

8   testimony that blood was seen on his shoes was "disproven" by DNA and luminol testing.  (*See*

9   Pet. at 9E.)

10        Sherrors raised this claim in his petition for review of his direct appeal to the California

11   Supreme Court.  (*See* Resp't Lodgment No. 5.)   The petition was denied without comment or

12   citation.  (*See* Resp't Lodgment No. 7.)   Thus, this Court must "look through" to the last

13   reasoned state court decision to address the claim, appellate court's opinion on direct review.

14   *See Ylst*, 501 U.S. at 801-06.  In denying Sherrors' sufficiency of evidence claim, the California

15   Court of Appeal stated:

16        Sherrors challenges the sufficiency of the evidence to support his
conviction, arguing that Hixon's testimony describing the series of events has to

17   be disregarded because (1) it was physically impossible for the events to have
occurred as she indicated and (2) as a prostitute and drug user, and based on her

18   repeated lies prior to and at trial and her statements to Katherine Davis implicating
herself more substantially, she was inherently unreliable as a witness.  Hall joins

19   in this contention.

20        In addressing this argument, we note that our role in reviewing the sufficiency of the
evidence to support a criminal conviction is limited.  (*People v. Ochoa* (1993) 6 Cal.4th

21   1199, 1206.)  Although we must ensure that the evidence adduced at trial in support of
the verdict is reasonable, credible, and of solid value, nonetheless it is the exclusive

22   province of the trier of fact to determine the credibility of the witnesses and the truth or
falsity of the facts on which that determination depends.  (*People v. Jones* (1990) 51

23   Cal.3d 294, 314.)  Thus, if the verdict is supported by substantial evidence, we must defer
to the findings of the trier of fact and not substitute our evaluation of a witness's

24   credibility for that of the fact finder.  (*Ibid.*)

25

26        A reviewing court may reject statements of a witness who was believed by
the trier of fact only if it is physically impossible that the statements are true or if

27   the falsity of the statements is apparent without resorting to inferences or
deductions.  (*Id.* at p. 1259; *see People v. Cudjo* (1993) 6 Cal.4th 585, 608.)  The
trier of fact's reliance on testimony revealing unusual circumstances and even

28   testimony that is subject to justifiable suspicion will not support a reversal of the
judgment on appeal.  ( *People v. Franz* (2001) 88 Cal.App.4th 1426, 1447; *People
v. Meals* (1975) 48 Cal.App.3d 215, 221-222.)

With these principles in mind, we conclude that there is sufficient evidence to support the defendants' convictions. Sherrors's counsel argued at length about Hixon's credibility and, in particular, that the events of the evening in question could not have happened as Hixon said. However, the jury was not required to accept or reject Hixon's testimony in its entirety, but was instead entitled to credit some portions and reject other portions of that testimony. (*People v. Flores* (1968) 267 Cal.App.2d 452, 457.) In so doing, the jury could have concluded that Hixon had a reason to lie in stating that Foth was in the trunk of the car during the drive north and thus rejected that testimony, concluding instead that Foth rode inside the car with Sherrors, Hall and Hixon. If Horne made the 6:50 p.m. phone call during that drive, it would not have been physically impossible for Sherrors and Hall to commit the murder and drive back to the AM PM, as Hixon testified, by 7:36 p.m. when the first attempt to withdraw money from Foth's bank account occurred. Alternatively, the jury may have accepted the prosecutor's argument that Hixon was mistaken that the stop at the AM PM was made on the return trip, but was in fact made on the way up to Highland Valley Road. Again, doing so would avoid the physical impossibility on which the defendants base their sufficiency argument.

Under the circumstances, the defendants have not shown that there was insufficient evidence to support their convictions.

(Resp't's Lodgment No. 4 at 20-22.)

In a sufficiency of the evidence claim, clearly established law requires the court determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Mikes v. Borg*, 947 F.2d 353, 356 (9th Cir. 1991). In making this determination, the Court is *not* "to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19. Rather, this Court must view the evidence in the light most favorable to the prosecution, and must presume the trier of fact resolved conflicting evidence in favor of the prosecution. *Jackson*, 443 U.S. at 319, 326; *Taylor v. Stainer*, 31 F.3d 907, 908-09 (9th Cir. 1994). Under *Jackson*, this court must look to the state criminal law in determining whether a factfinder could have found the petitioner guilty beyond a reasonable doubt. 443 U.S. at 324.

Here, Sherrors was convicted of murder in the first degree in that he unlawfully killed Foth with "malice aforethought" or he killed Foth "during the commission or attempted commission of a robbery." (*See* Resp't Lodgment 15 at 260, CALJIC No. 8.10.) The jury also had to find that Sherrors personally used a deadly or dangerous weapon (*id.* at 285, CALJIC 17.16); and that the murder was committed by Sherrors while he was engaged in the commission or attempted commission of a robbery, and in furtherance of that robbery. (*See* Resp't Lodgment

No. 15 at 276.)

The crux of Sherros' argument centers on the implausability of Hixon's testimony, particularly with regard to the timing of events.[8]  He argues it was not possible for the murder to have happened as Hixon testified because it was physically impossible for the murder to have taken place in the amount of time between  Foth's final cell phone conversation with Horne, which occurred at 6:50 p.m., and the first attempt to use Foth's ATM card, which  occurred at 7:36 p.m.

Hixon testified that the entire time she was with Foth, she never saw him using a cell phone, thus implying that Foth approached her sometime after 6:50 p.m.  Hixon stated that after Foth approached her and asked her for drugs, she got in his car and they drove a few blocks away to the apartment where Sherrors and Hall were staying.  (*Id.* at 944-46.)  She whistled for them to come out, and after they did, she got out of the car and Foth left with Sherrors and Hall.  (*Id.* at 948-55.)  Sherrors and Hall returned a few minutes later, with Sherrors driving the Audi.  Foth was nowhere in sight.  (*Id.* 955.)  Sherros told Hixon to get in, and trio drove off together.[9]  (*Id.* at 955-58.)

According to Hixon, the group drove north on I-15 and exited in the Lake Hodges area.  They came to a dirt lot next to a pumpkin patch.  Sherrors parked the car, and both men got out.  They told Hixon to wait in the car and they would be right back.  (*Id.* at 962-64.)  She then noticed the trunk open and saw Foth getting out of the trunk.  He was fully clothed and his hands were tied in front of his body.  (*Id.*)

Hixon then got out of the car, asking "what the Hell is going on?"  As Hall stood by Foth, Sherrors approached her grabbed her hands and told her to shut up or he'd kill her.  (*Id.* at 964-65.)  When Sherrors grabbed Hixon, she broke an arcrylic fingernail, which was later found at the scene.  (*Id.* at 439-40, 492-93, 970.)

---

[8]  Sherros' defense counsel attempted to suggest the murder had actually been committed by Hixon and Jimmie Washington (and possibly another).  Jimmie Washington was originally expected to testify for the prosecution in this case but the trial court found him incompetent to testify because he could not understand the oath and seemed delusional.

[9]  Hixon testified that when she asked where Foth was, Sherrors told her they had exchanged drugs for the use of his car.  She stated that did not surprise her because it was not unusual for dealers to "rent" a customer's car, temporarily, in return for drugs.  (Resp't Lodgment No. 17 at 955-56.)

1   Hall then wrestled Foth to the ground and Sherror began stabbing Foth, numerous times.[10]

2   After a while, Sherrors walked over to Hixon and ordered her to stab him.  When she refused,

3   Sherrors warned Hixon, "What do you think, we're just going to let you walk away?  If I go

4   down, your going down with me."  (*Id.* at 965-67.)  Hixon testified that she only complied out

5   of fear for her safety and that of her children.

6   Sherrors and Hall then removed Foth's clothing and flung the body over a fence.  Sherrors

7   ordered Hixon to get back in the car and they drove off, getting back on I-15, headed south

8   toward San Diego.  After driving five or ten minutes, they pulled off the freeway at an exit with

9   "Scripps" in the sign and pulled into an ARCO AM/PM.  Hall went in and came out with a pack

10  of cigarettes, shaking his head.  (*Id.* at 977.) Wells Fargo Bank records showed two unsuccessful

11  attempts to use Foth's ATM card that evening.  The first occurred at 7:36 p.m. at an ATM on

12  Mira Mesa Boulevard.  While the correct PIN number was used and the account had a positive

13  balance of $130.33, no cash was dispersed because the bank's loss prevention department had

14  frozen Foth's account six days earlier.[11]  (*Id.* at 714-17.)

15  Defense counsel argued strenuously that it would be physically impossible for all that

16  Hixon testified to, to occur in 46 minutes.  According to Hixon's testimony, they spent about 30-

17  45 minutes at the pumpkin patch alone.  (*Id.* at 1073-75, 1148.)  She also stated that it had taken

18  about 45 minutes for them to reach the pumpkin patch.  (*Id.* at 960, 1083.)  They did not even

19  start driving until 15 or 20 minutes after Sherrors and Hall originally left with Foth.[12]  (*Id.* at 948,

20  955, 1120-21.)  Given these inconsistencies, Sherrors argues that Hixon's testimony should be

21  disregarded in its entirety.

22  While a reading of the transcript may suggest inconsistencies in Hixon's testimony, the

23  "jury had an opportunity to hear [Hixon's] inflections and witness [her] demeanor, and it had the

24

25  _____

[10]  Foth was stabbed a total of 83 times.  (Resp't Lodgment No. 17 at 167.)

26  [11]  The second attempt to use the ATM card occurred at 8:56 p.m. at a Wells Fargo bank branch's

27  ATM on El Cajon Boulevard.  (*Id.* at 717-18.)

28  [12]  Hixon, who did not wear a watch, estimated it took three minutes to drive from the taco shop to the apartment.  She then estimated that 15-20 minutes passed between the time Sherrors and Hall drove off with Foth and when Sherrors and Hall returned, apparently alone.  (*Id.* at 948, 955, 1120-21.)

right to credit some parts of [her] testimony and to discredit other parts based on these observations." *See United States v. Ponticelli*, 622 F.2d 985, 988 (9th Cir. 1980) (*overruled on other grounds in United States v. DeBright*, 730 F.2d 1255, 1259 (9th Cir. 1984)(en banc).

Taking the facts in the light most favorable to the verdict, it is possible that the jury credited the testimony regarding who murdered Foth and how it happened, but disregarded some testimony that Hixon may have seemed unsure of, or inconsistent about, such as timing. In fact, the jury was instructed that it may do just that. (*See e.g.* CALJIC No. 2.21.1; Resp't Lodgment No. 14 at 237.) For instance, Hixon testified that she never saw Foth on the cellphone. It is possible the jury discredited that testimony based on Hixon's possibly faulty memory. It is also possible that Foth took the 6:50 p.m. call when he was alone in the car with Sherrors and Hall (and before the situation became violent). Or, it is possible that the jury simply did not find Hixon's time estimates to be credible, given that she stated she never wore a watch and gave some innacurate estimates as to the amount of time between events. Or, the jury could have believed it more likely that the attempt to use Foth's ATM card occurred before they got to the pumpkin patch and before he was murdered.

Even with the inconsistencies apparent in Hixon's testimony, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 324. Hixon testified that Sherrors commented on losing his watch at the crime scene. (Resp't Lodgment No. 17 at 972.) Latrina Walker corroborated Hixon's testimony when Walker testified that she saw Sherrors come home on the night of the murder in a bloody shirt and shoes, and with his watch missing. (*Id.* at 1348, 1360, 1371-74.) Walker identified the watch found at the scene as one belonging to Sherrors. (*Id.* at 1342-44.) After he changed clothes he left the house and minutes later a small fire was reported next to the dumpster in the apartment complex parking lot. (*See id.* at 1352, 1360, 382-85, 388-89.) This corroborates Hixon's testimony that Sherrors stabbed Foth numerous times and, and a reasonable juror could infer that Sherrors attempted to get rid of the tainted clothing by setting it on fire.

Viewing the evidence in the light most favorable to the verdict, there was also sufficient evidence that Sherrors killed Foth during the commission of a robbery. Neighbors testified they

1   saw Hall and Sherrors either driving or standing near the Audi in the days after the murder. This

2   corroborated Hixon's testimony that the men had killed Foth and taken his car. (Resp't

3   Lodgment No. 17 at 752-54, 890-93.) Further, two cigarette butts were found in the Audi and

4   tested for DNA. The first butt from the rear floorboard contained a mixture of DNA. Foth,

5   Jimmie Washington and Hall were all excluded. (*Id.* at 660-64.) The other cigarette butt found

6   on the driver's side floorboard revealed Sherrors as the very likely source of the DNA - with an

7   estimated odds of one and 1.6 trillion. (*Id.* at 666.) The evidence that Sherrors and Hall were

8   seen in and around the Audi suggests they killed Foth in an attempt to steal his car or his money.

9   This is ample evidence to corroborate a large part of Hixon's testimony, and remaining issues

10  of credibility are for the jury to decide. *See United States v. Sisack*, 527 F.2d 917, 921 (9th Cir.

11  1975).

12      Sherrors seems to argue that Walker's testimony that the watch found at the crime scene

13  belonged to Sherrors was "disproven" by DNA testing. That is a mischaracterization of the

14  evidence. Brian Burritt testified that he originally tested the watch for DNA in three places.

15  Sherrors, Hall and Hixon were excluded as the primary sources of the DNA obtained from those

16  three areas, while Foth could not be excluded. (Resp't Lodgment No. 17 at 340.) However,

17  Burritt testified that there was a trace secondary source taken from the back of the watch.

18  Sherrors could not be excluded as the source of the trace result. (*Id.* at 350.) Although Sherrors

19  could not be excluded, Burritt testified that the trace was "exceedingly small amount, an amount

20  that is really almost too weak for us to – even if he was there, to make any conclusions based on

21  that." (*Id.*) Thus, Burritt's testimony did not "disprove" Walker's testimony that the watch

22  belonged to Sherrors. It merely failed to find any conclusive evidence of Sherrors' DNA on the

23  watch except for a trace amount on one area tested. As Burritt testified "[Sherrors] is excluded

24  from the vast majority of the DNA, the main result. We have this trace 2. We have a potential

25  mixture of DNA." (*Id.* at 350.) The jury was free to give this evidence the weight it deemed

26  appropriate.

27      Finally, Sherrors alleges that luminol testing was negative for blood in the bedroom in

28  which he changed his clothing on the night of the murder. He seems to argue that the failure to

find blood traces "disproves" Walker's testimony that she saw blood on his shirt and his shoes when he returned to the apartment on the night of the murder.  Again, these discrepancies between witness testimony and scientific evidence are for the jury to resolve.  This court must review the evidence in the light most favorable to the verdict. A rational juror could certainly have Walker's testimony despite that failure to find any blood.

In sum, viewing the evidence in the light most favorable to the verdict, there was enough evidence for a rational trier of fact could have found Sherrors guilty beyond a reasonable doubt. *See Jackson*, 443 U.S. at 324.  The state court's denial of this claim was neither contrary to, nor an unreasonable application of clearly established law.  Thus, the Court recommends this claim be denied.  *See Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254.

### d.    Ground Twelve:

In Ground Twelve, Sherrors argues that his due process rights were violated by the introduction of Hixon's testimony because the prosecutor knew her testimony was perjurious. As he did in his sufficiency of evidence claim, Sherrors argues that Hixon's testimony was "conclusively disproven" by other evidence regarding the timing of events on the night in question.  He claims there was evidence the prosecutor knew Hixon was lying.

Sherrors raised this claim his petition for review of his direct appeal to the California Supreme Court.  (*See* Resp't Lodgment No. 5.)  The petition was denied without comment or citation.  (*See* Resp't Lodgment No. 7.)  Thus, this Court must "look through" to the last reasoned state court decision to address the claim, appellate court's opinion on direct review. *See Ylst*, 501 U.S. at 801-06.

In denying Sherrors' claim,[13] the appellate court stated:

> Hall claims that the prosecutor committed misconduct here by using Hixon as a witness in light of the inherently improbable or physically impossible nature of her testimony. Where a conviction is based on the introduction of testimony known by the prosecution to be false, it may constitute a denial of due process of law. (*People v. Gordon* (1973) 10 Cal.3d 460, 473.)  However, to succeed on a claim that the prosecutor engaged in such misconduct, the defendant must show, by a preponderance of the evidence, that the prosecutor adduced perjured testimony at trial, that the prosecutor knew of the perjurious nature of the

---

[13] The court of appeal opinion refers to Sherrors' co-defendant, Willard Hall, in addressing this claim.  Sherrors joined Hall's argument on appeal.  (*See* Resp't Lodgment No. 1 at 66.)

testimony and that the testimony may have affected the outcome of the trial. (*Ibid.*)

Hall has not met this burden here. The prosecution simply presented its evidence and allowed a fully informed jury to evaluate it. Hall has not shown that Hixon's testimony was in fact perjured rather than the result of faulty memory or that the prosecutor knew Hixon's testimony was false in any particular respect. Allowing Hixon to testify subject to cross-examination and impeachment by available evidence, as was done here, afforded Hall a fair trial and comported with due process. (*People v. Riel* (2000) 22 Cal.4th 1153, 1181-1182.)

(Resp't Lodgment No. 4 at 15.)

It is clearly established that "[t]he knowing use of perjured testimony by a prosecutor generally requires that the conviction be set aside." *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976).) "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. People of the State of Illinois*, 360 U.S. 264, 269 (1959). However, the presentation of conflicting versions of events, without more, does not constitute knowing presentation of false evidence. *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (citing *United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1989).) Rather, "[i]t [i]s within the province of the jury to resolve the disputed testimony." *Id.*

Prosecutors will not be held accountable for discrepancies in testimony where there is no evidence from which to infer prosecutorial misconduct. *See United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir.1995). A factual basis for attributing knowledge to the government that the testimony was perjured must be established. *See Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004). In sum, in order to prevail on a claim based on *Agurs* and *Napue*, a petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material. *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (*citing Napue*, 360 U.S. at 269-71.)

The state court's denial of this claim was not contrary to, nor an unreasonable application of, clearly established law. Although Hixon's version of events did not entirely comport with other evidence or other testimony, there is no indication that the testimony was actually false,

as opposed to just a matter of Hixon's poor memory.  At most, two conflicting versions of the incident were presented to the jury.  It was within the province of the jury to resolve the disputed testimony. *See United States v. Awkard*, 597 F.2d 667, 671 (9th Cir.1979) (recognizing that credibility determinations are for the jury).  Further, there is nothing to indicate that the prosecutor knowingly presented perjured testimony.  While the prosecutor was aware that some of the details of Hixon's testimony were inconsistent with other evidence,  particularly with regard to her time estimates,  there was nothing to indicate he knew she was lying, rather than simply mistaken or had forgotten certain details.

Sherrors argues that Hixon's testimony was "conclusively disproven" by other evidence regarding the timing of events on the night in question.  This is not the case.  There were simply two conflicting versions of the evidence regarding the timing of certain events.  This, without more, does not constitute knowing presentation of false evidence.  *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002).

Sherrors has not shown the Hixon's testimony was false, nor has he shown that the prosecutor knowingly presented false testimony.  Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established law.  Thus, the Court recommends this claim be denied.  *See Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254.

### e.    Ground Thirteen

In Ground Thirteen, Petitioner claims his due process rights were violated because Hixon's testimony was coerced by the police and prosecution.  He claims Hixon was encouraged to lie by police officers, who told her she would receive leniency if she altered her story.  He alleges that Hixon fabricated the story in order to reach the plea agreement and get the murder charges against her dismissed.  She was compelled to testify falsely out of fear that she would lose her plea deal.  Finally, he claims Hixon was intoxicated during her interview with police. (Pet. at 9E-9F.)

Sherrors raised these claims for the first time in his petition for writ of habeas corpus to the California Supreme Court (Resp't Lodgment No. 13) which denied them without comment

or citation of authority. (*See* Lodgment No. 14.)  Thus, this Court must "look through" to the last reasoned state court decision to address the claim, the appellate court's opinion denying his habeas corpus petition, as the basis of its analysis. *Ylst*, 501 U.S. at 801-06.   In denying the claim, the appellate court stated:   "[Sherrors] provides no proof to support the [claim that a witness was coerced by police and prosecutor.] (Resp't Lodgment No. 12 at 1.)

It is clearly established that, although Sherrors lacks standing to complain about infringements of Hixon's constitutional rights, *see Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978), he is entitled to habeas relief if the trial court's admission of Hixon's testimony rendered the trial so fundamentally unfair as to violate due process. *See Karis v. Calderon*, 283 F.3d 1117, 1129 n. 5 (9th Cir.2002); *Jeffries v. Blodgett*, 988 F.2d 923, 934-35 (9th Cir.1993).

The admission of Hixon's testimony did not render the trial fundamentally unfair.  First, the police tactics used to encourage her to tell the truth were not coercive.  An interrogating agent's suggestion that a suspect's cooperation with the government will have a positive effect on the suspect's possible sentence is not an improper inducement that causes the suspect's later testimony for the government to be involuntary. *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988); *see also United States v. Moody*, 778 F.2d 1380, 1384-85 (9th Cir.1985) (witness testimony provided pursuant to a plea agreement was not involuntary or coerced). *Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004).

Here, the police merely suggested that Hixon needed to tell the truth or any chance of making a deal with the district attorney would be lost.  On October 12, 1999,  Hixon was interviewed by the police for the second time. (*See generally* Resp't Lodgment No. 15 at 169-202.)  It was during this interview that she admitted she had lied about who committed the murder and implicated Sherrors and Hall.[14]   (*See* Resp't Lodgment No. 15 at 170-72.)  During the interview, the officers pushed her to tell the truth, telling her that if she continued to lie, there would be no chance of her striking a deal with the district attorney.  At one point, the officer told

---

[14]   The police had intercepted a phone call Hixon made from jail, during which she told her friend, Eric Bazile, that she had lied when she told the police that the murder was committed by Ben Wilson and Terrence Smallgreen.  She told Bazile that it was really Hall and Sherrors. (Resp't Lodgment No. 15 at 169-70.)

1   Hixon, "this is absolutely your last chance. . . [t]here is a good possibility that the district

2   attorney that's gonna look at this case may not believe any story you tell, and with the evidence

3   we have, you might just have. . . .to take the whole damn rap for this case.  If you're not careful

4   and you don't tell the truth, then there's a good possibility that we may not be able to arrest

5   anybody else and you may just be sittin' here by your lonesome, going to court, going to

6   prison . . . ." (Resp't Lodgment No. 15 at 179-80.)

7        The interviewing officer here was merely encouraging her to tell the truth by indicating

8   that, if she did so, she may be able to make a plea agreement with the district attorney; and that

9   failure to do so, would likely mean she would spend the rest of her life in prison.  The officer's

10  actions here did not amount to "improper inducement" sufficient to render the trial

11  fundamentally unfair. *See Leon Guerrero*, 847 F.2d at 1366; *see also Moody*, 778 F.2d at

12  1384-85.

13       Furthermore, the prosecutor did not improperly "coerce" Hixon's into testifying against

14  Sherrors and Hall.  Hixon did not meet with prosecutors until after her preliminary hearing, to

15  ascertain whether she could make a deal.  As she testified at trial, she was told the conditions of

16  the agreement and that, in exchange for her *truthful* testimony, she would be permitted to plead

17  to lesser charges and receive a 12 year sentence.  (Resp't Lodgment No. 17 at 906-15.)  There

18  is "no indication that [Hixon] was told at any time by anyone what she should say on the witness

19  stand." *See United States v. Mattison*, 437 F.2d 84, 85 (9th Cir. 1970).  Moreover, Sherrors'

20  defense counsel had the opportunity at trial to test the voluntariness and veracity of Hixon's

21  testimony through a vigorous cross-examination.  *See Williams*, 384 F.3d at 596.  Thus, the

22  prosecutor's offer of a plea agreement in exchange for the *truth* did not amount to "improper

23  inducement." *See Moody*, 778 F.2d at 1384-85; *Williams*, 384 F.3d at 595.

24       In addition, clearly established Supreme Court law does require the disclosure of a plea

25  agreement which bears on the credibility of a prosecution witness. *Giglio v. United States*, 405

26  U.S. 150, 153-54 (1972).  The Ninth Circuit has held that "[a]n agreement that requires a witness

27  to testify truthfully in exchange for a plea is proper so long as 'the jury is informed of the exact

28  nature of the agreement, defense counsel is permitted to cross-examine the accomplice about the

agreement, and the jury is instructed to weigh the accomplice's testimony with care.'" *Allen v. Woodford*, 395 F.3d 979, 995 (9th Cir.), cert. denied, 126 S. Ct. 134, 163 (2005) (quoting *United States v. Yarbrough*, 852 F.2d 1522, 1537 (9th Cir. 1988).); accord *Morris v. Woodford*, 273 F.3d 826, 836 (9th Cir. 2001).

*Allen's* requirements were satisfied in this case. The jury was informed that Hixon testimony had entered an plea agreement which allowed her to plea to lesser charges in exchange for her testimony. The prosecutor began his questioning of Ms. Hixon with a discussion of the agreement.

MR. BOWMAN:     Miss Hixon, you were formally charged with murder in this case, correct?

MS. HIXON:     Yes.

Q.     And you have since pled guilty and agreed to testify on behalf of the People of the State of California in this case; is that correct?

A.     Yes, I have.

Q.     All right. Did you enter into an agreement with the People the was memorialized in a written document to that effect?

A.     Yes.

(Resp't Lodgment No. 17, vol. 7 at 906-07.) A copy of the agreement was then introduced into evidence. (*Id.*) The prosecutor then questioned Hixon at length about every detail of the agreement. (*Id.* at 906-915.)

Further, Defense counsel cross-examined Hixon at length about her testimony and the plea agreement. Rather than arguing that Hixon was coerced by the police or prosecutor, defense counsel attempted to suggest that Hixon had only decided to enter into an agreement after she heard the damaging testimony of Katherine Davis (another prisoner housed with Hixon), who testified against her at the preliminary hearing.

Q:     Okay. Now, how much – when did you first decide that you wanted to cooperate with the prosecution?

A:     Um, I can't really pinpoint a time.

Q:     Well, you weren't cooperating with them at the - - before the preliminary hearing, right?

-31-

1          [ . . . ]

2    A:    Can you repeat [the question]?

3    Q:    Okay. Remember the preliminary hearing in this matter where Katherine Davis testified against you, basically?

4    A:    Yes.

5    Q:    That was on April 3 of 2000, okay?

6    A:    Yes.

7    Q:    Before that time you weren't cooperating with the prosecutor, were you?

8,9    A:    I don't think I had a conversation with the prosecutor to cooperate with him.

10    Q:    You hadn't.

11    A:    No.

12

13,14    Q:    Okay.  So sometime after Katherine Davis's testimony at the preliminary hearing you contacted or had your attorney contact the prosecutor and inform them that you were willing to now cooperate, correct?

15    A:    I believe that's how it happened.

16,17    Q:    And that happened between - - sometime after the preliminary hearing, which took place on April 3, of 2000, and before you had your free talk, which was May 17th of 2000.  So, in that approximately a month and two-week period, that's when you decided to cooperate, correct?

18,19    A:    Yes

20,21    Q:    Okay.  And it was after Katherine Davis came forward and testified at the preliminary hearing that you approached the prosecutor?

22    A:    No. Well, basic- -- I mean, technically, yes.

23    Q:    I mean, you didn't approach them before Katherine Davis testified?

24    A:    No.

25,26    Q:    Okay. Then you had what's called a free talk with Mr. Bowman and others, and your lawyer was there, correct?

26    A:    Yes.

27,28    Q:    That was May 17th.  And then on June 7th, a little less than a month later, you signed an agreement, correct?

1    A:    Yes.

2    Q:    Okay.  And you signed an agreement with the prosecutor, correct?

3    A:    Yes.

4    Q:    Where you would plead guilty to something other than murder, correct?

5    A:    Yes.

6    Q:    Okay.  In return for your testimony against these two men, correct?

7    A:    Yes.

8    Q:    Okay.  And you would get a 12 year sentence, correct?

9    A:    Yes.

10   Q:    And, in fact, you have been sentenced to 12 years, correct?

11   A:    Yes, I have.

12   (Resp't Lodgment No. 17 at 1087-94.)

13        Through this exchange the defense attempted to show that Hixon only decided to

14   cooperate when she realized that Katherine Davis would testify that she had participated much

15   more fully in the murder than Hixon admitted to police.  Moreover,  Sherrors' defense counsel

16   tested the voluntariness and truthfulness of Hixon's testimony through a vigorous

17   cross-examination.  (*See* Resp't Lodgment No. 17 at 991-1087.)  *See Williams*, 384 F.3d at 596.

18        Finally, it is worth noting that Hixon's decision to enter into a plea agreement came over

19   six months after her interview with police.  And her trial testimony did not take place until

20   almost a year later.  Thus, even assuming arguendo that Hixon was coerced, "with this passage

21   of time, the physically and psychologically coercive atmosphere of the interrogation had

22   certainly dissipated."  *See Mattison*, 437 F.2d at 85 (finding that the coercion of the witness's

23   illegal post-arrest interrogation had dissipated by the time of trial).  Thus, the introduction of

24   Hixon's testimony at trial did not render it fundamentally unfair.

25        Sherrors has not shown his due process rights were violated.  Therefore, the state court's

26   denial of this claim was neither contrary to, nor an unreasonable application of, clearly

27   established law.  Accordingly, the Court recommends this claim be denied.  *See Williams*, 529

28   U.S. at 412-13; 28 U.S.C. § 2254.

1  **2.      *Claims Related to Witness Latrina Walker's Tesimony***

2        Sherrors also raises several claims related to the testimony of Latrina "Trina" Walker.

3  Walker was Sherrors' 24 year-old, mentally disabled sister.  (Resp't Lodgment No. 17 at 1362.)

4  She was from Long Beach, but was visiting Sherrors at the time the murder took place.  (*Id.* at

5  1340-42.)  She testified that the watch found at the murder scene was the same one she had seen

6  Sherrors wearing during the time of the murder. She also testified that on the night of the murder

7  took place, when Sherrors returned to the apartment, she noticed what appeared to be blood on

8  his shoes and his shirt.  (*Id.* at 1348, 1357, 1360, 1371-72, 1372-74.)   Sherrors then went into

9  his room, changed his clothes and shoes and left the apartment soon thereafter, carrying a bag.

10 (*Id.* at 1352, 1360.)   Moments after Sherrors left with the bag, a small fire near the trash

11 dumpster was reported.  (*Id.* at 1352.)

12       Sherrors raises three grounds for relief related to Trina Walker's testimony.  (*See* Pet. at

13 9A-9B, 9C.)  As with previous grounds, Sherrors often includes two or three separate claims

14 within each ground for relief.  The Court will address each ground and all the claims included

15 therein, in turn.

16             **a.      Ground Three**

17       In Ground Three, Sherrors raises several constitutional claims stemming from the trial

18 court's decision to preclude defense counsel from (1) asking Walker about "specific instances

19 of dishonesty and theft"; (2) calling Walker's former therapists to testify as to her psychiatric

20 condition; (3) cross-examining Walker about her mental condition and its effect on her veracity.

21 (Pet. at 9A.)  He claims this amounted to a violation of Due Process and the Confrontation

22 Clause.  In addition, he argues trial counsel was ineffective in handling the issues raised.

23       Sherrors raised these claims in a petition for writ of habeas corpus to the California

24 Supreme Court.  (Respt's Lodgment No. 14.)  Because that court did not furnish a basis for its

25 denial of the claim, the Court must look through to the last reasoned decision to address this

26 claim, the superior court order denying Sherrors habeas relief.  *See Ylst*, 501 U.S. at 801-06.

27       In denying this claim, the court stated:

28            The trial court precluded expert testimony that Trina Walker was retarded
             pursuant to Evidence Code § 352 on the ground that it was cumulative as that fact

1    was already before the jury.  (RT 1597-98.)  The trial court also precluded
2    evidence of specific incidents of theft and dishonesty pursuant to that section.  (RT
     1583.)  It is clear from the record provided for the Court's review that the trial
3    court did not abuse its discretion in this regard.  Moreover, the trial court allowed
     testimony that Ms. Walker had a reputation for being untruthful.  (RT 1584.)

4    (Resp't Lodgment No. 10 at 4.)

5        The state court decision did not address the constitutional aspects of Sherrors claims

6    However, as the Supreme Court has noted, a state court need not cite Supreme Court precedent

7    when resolving a habeas corpus claim.  *Early*, 537 U.S. at 8.  "[S]o long as neither the reasoning

8    nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court

9    decision will not be "contrary to" clearly established federal law.  *Id.*

10            *(1)    Background*

11        After hearing Walker's testimony at the preliminary hearing, defense counsel sent an

12   investigator to meet with Walker about the possibility of releasing her medical records.

13   (*See* Resp't Lodgment No. 17 at 66-68.)  The investigator met with Walker and her aunt and both

14   ultimately signed the waiver of privilege form allowing Walker's juvenile records to be released

15   to the defense.  (*Id.* at 68-69.)  Among these records were reports regarding psychological

16   evaluation of Walker which took place in 1993, 1994, and 1997.  Some of these reports

17   contained conclusions that, due to Walker's disability, she seemed prone to making things up.

18   (*Id.* at A6, A8.)  The defense sought to introduce these reports in order to impeach Walker's

19   testimony.

20        Before trial, however, Walker complained that she did not wish the contents of her

21   medical and psychological reports to be made public.  She then asserted that her waiver of

22   privilege, which she had signed in the presence of the defense investigator, was invalid because

23   it was not knowing and voluntary.  The trial court held a hearing to determine that issue.  (*Id.* at

24   56-91.)  At the hearing Walker and her aunt testified that they did not understand what they

25   were signing when they signed the waiver.  (*Id.* at 51-52, 58)  Further, they testified that they

26   thought the defense investigator actually was working for the District Attorney's Office.  (*Id.*)

27   Ultimately, in light of this testimony, the court concluded the waiver was not knowing and

28   voluntary.  Thus, the court ruled that the reports were subject to patient-psychotherapist

1  privilege. (*Id.* at 1597-99.)

2  (2)    *Cross-Examination of Walker and Confrontation Clause*

3  Sherrors claims the trial court improperly precluded defense counsel from thoroughly

4  impeaching Walker's testimony through cross-examination – specifically because it precluded

5  defense counsel from asking Walker about specific instances of theft and dishonesty and

6  questioning about how Walker's disability affected her veracity. (Pet. at 9A-B.)  The trial court

7  precluded defense counsel from asking Walker about specific instances of theft and dishonesty

8  based on Cal. Evid. Code § 352 on the basis that the probative value did not outweigh the

9  prejudicial effect.  (Resp't Lodgment No. 17 at 1599.)  The trial court precluded cross-

10  examination about her disability because of privilege and pursuant to Cal. Evid. Code § 352,

11  ruling that it was cumulative because Walker had already admitted she had been diagnosed with

12  mental retardation.  (*Id.* at 1597-1599.)

13  The Sixth Amendment guarantees an accused the right to confront and cross-examine

14  adverse witnesses. *Davis v. Alaska*, 415 U.S. 308 (1974).  However, "trial judges retain wide

15  latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such

16  cross-examination based on concerns about, among other things, harassment, prejudice,

17  confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally

18  relevant. . . .the Confrontation Clause guarantees an opportunity for effective cross-examination,

19  not cross-examination that is effective in whatever way, and to whatever extent, the defense

20  might wish." *Delaware v. Van Arsdall*, 475 U.S. at 679; *Wood v. Alaska*, 957 F.2d 1544, 1549

21  (9th Cir. 1992); *Hughes v. Raines*, 641 F.2d 790, 792 (9th Cir. 1981).

22  A Sixth Amendment violation exists when cross-examination is limited only if the trial

23  court abuses its discretion.  *Wood*, 957 F.2d at 1550.  To determine whether cross-examination

24  was limited in violation of the Sixth Amendment, it is necessary to examine: 1) the relevance of

25  the excluded evidence; and 2) whether other legitimate interests outweighed the defendant's

26  interest in presenting the evidence. *United States v. Payne*, 944 F.2d 1458, 1469 (9th Cir. 1991);

27  *Wood*, 957 F.2d at 1549-50; *Hughes*, 641 F.2d at 792.  Even assuming the defense witness's

28  proffered testimony was relevant, the court's ruling [does] not violate the Sixth Amendment if

the jury had sufficient information to appraise the prosecution witness's motivation.  *See Chipman v. Mercer*, 628 F.2d 528, 530 (9th Cir. 1980); *Skinner v. Cardwell*, 564 F.2d 1381, 1389 (9th Cir. 1977).

Here, Sherrors argues defense counsel should have been permitted to ask Walker about specific instances of dishonesty and theft and the affect her disability had on her ability to tell the truth.  This evidence was certainly relevant, because it went to Walker's credibility as a witness.  Since Walker had provided key testimony against Sherrors, it was important to the defense to discredit her to the extent possible.  Walker had testified that she saw blood on Sherrors' shirt and shoes and she also identified the watch found at the scene as belonging to Sherrors.  Without Walker's testimony, it would have been much more difficult to corroborate Lena Hixon's testimony.  Thus, the testimony was quite relevant.

However, while the court precluded cross-examination regarding specific instances of dishonesty and theft and how Walker's disability affected her ability to testify truthfully, the jury did hear evidence regarding Walker's tendency to make things up.  Walker's aunt, Brenda Earle testified that Walker was "unreliable and "not truthful at all."[15]  (Resp't Lodgment No. 17, vol. 11 at 1581.)  Defense counsel also called Walker's mother, Joyce George, to testify as a witness. George testified that stated that "[Walker] has a way of distorting the truth.  She doesn't understand reality from illusion, you know.  She somewhat gets it mixed up.  She doesn't understand on the level that we do."  She went on to state that "[Walker] distorts a lot of things. She exaggerates.  She believes something happened sometimes that it didn't."  (*Id.* at 1714.) Given this testimony, the jury had sufficient information, even without the proffered evidence, to appraise the Walker's motivation.  *See Chipman v. Mercer*, 628 F.2d 528, 530 (9th Cir. 1980); *Skinner v. Cardwell*, 564 F.2d 1381, 1389 (9th Cir. 1977).

Moreover, defense counsel was able to cross-examine Walker, to a certain extent, regarding her mental disability.

> Q:    Let me ask you this, Trina: You're receiving disability now from the Social
>        Security Administration, correct?

---

[15]  Counsel attempted to delve into specific examples of Walker's untruthfulness, but the trial court ruled that such testimony was irrelevant and inadmissible.  (*Id.* at 1583.)

A:      I have that for the rest of my life.

Q:      I understand.  And that's because you've been diagnosed as developmentally disabled, correct?

A:      Yes.

Q:      And you've also been diagnosed as mentally retarded, correct?

A:      I'm not mentally retarded.  I know some things.  But, yes, that's what's on my records.

[. . . .]

Q.      You were taken to see some doctors at some point in your life; isn't that right.

A:      Yes, a psychiatrist when I was younger.

Q:      And one of the reasons why you were taken to see the doctors was because you made things up, isn't that true?

A:      No.  What I just remember in my past is that – –

COURT:     Wait a minute.  You can either answer that question "yes" or "no."  No one's going to probe into discussions with doctors.  Those are personal and confidential and can't be invaded.  So I'm not going to permit it.

(Resp't Lodgment No. 17 at 1362, 1364.)

Although the court prevented defense counsel from asking about Walker's disability and her tendency to make things up, as discussed above, this testimony was elicited by the defense through the testimony of Earle and George.  Thus, the jury was able to sufficiently assess Walker's credibility.   In sum, Sherrors had an "opportunity for effective cross-examination" despite the limitations imposed by the trial court.  *See Van Arsdall*, 475 U.S. at 679.  Accordingly, there was no violation of the Confrontation Clause.  Thus, the state court's denial of this claim was neither contrary to, nor an unreasonable application of clearly established law.

*(2)      Exclusion of Expert Testimony of Former Therapists*

Sherrors also claims his due process rights were violated when the trial court excluded expert testimony regarding Walker's disability and its affect on her ability to be truthful.  Here, the trial court precluded testimony of therapists who had generated the reports discussed above, because it found the evidence cumulative and an invasion of Walker's psychotherapist-patient privilege.  (Resp't Lodgement No 17 at 1598-99.)

-38-

1    A state court's erroneous evidentiary ruling cannot form the basis for federal habeas relief

2    unless federal constitutional rights are affected. *Whelchel v. Washington*, 232 F.3d 1197, 1211

3    (9th Cir. 2000) citing *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir.1987).  "'The state court's

4    decision to exclude certain evidence must be so prejudicial as to jeopardize the defendant's due

5    process rights.'" *Id.*, (*quoting Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir.1985), *amended on*

6    *other grounds*, 768 F.2d 1090 (9th Cir. 1985).  The Ninth Circuit has identified five factors a

7    court should consider when deciding whether a court's exclusion of defense evidence violates

8    the Constitution: "(1) the probative value of the excluded evidence on the central issue; (2) its

9    reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole

10   evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the

11   attempted defense." *Id.* (*citing Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir.1990)).  The court

12   "'must then balance the importance of the evidence against the state interest in exclusion.'" *Id.*

13   citing *Tinsley*, 895 F.2d at 530.

14   Here, the first *Tinsely* factor weighs in Sherrors' favor.  The testimony of psychologists

15   regarding Walker's ability to be truthful would have been probative on the issue of Walker's

16   credibility because Walker's testimony arguably provided the most significant corroboration of

17   Hixon's testimony, any evidence that would impugn her credibility would have been highly

18   probative.

19   The second factor weighs in favor of Sherrors.  The therapist testimony would tend to be

20   reliable, these therapists evaluated Walker in 1993, 1994, and 1997 – when Walker was still a

21   juvenile.  However, their recollection may have been hampered by the lapse in time.  Moreover,

22   their diagnoses and determinations as to Walker's disability when she was as young as teenager

23   would not necessarily be applicable to Walker's current abilities.  The third factor also weighs

24   in Sherrors' favor.  The therapist's testimony would be susceptible to evaluation by the jury.

25   Again, however, given the passage of time between the evaluations and the testimony regarding

26   those evaluations it could prove difficult to assess the probative value of it to the Walker's

27   *present* testimony.

28   The fourth factor, however, weighs heavily in favor of precluding the evidence.  The

court had permitted the testimony of George and Earle, who both testified that Walker had a tendency to "make things up."  Both George and Earle raised Walker and were in as good (or better) position to testify to Walker's general credibility.  Thus, even if the memories of the therapists had been clear, unequivocal and concise, the testimony would have been cumulative, and more notably, likely inferior to the testimony of Earle and George, who were family, and in possibly the best position to evaluate Walker's credibility.

Finally, the fifth *Tinsley* factor weighs in favor of the defense.  The defense's theory was murder.  This required showing that Hixon was lying.  Thus, undercutting any testimony that corroborated Hixon's testimony was a significant part of the defense.

In balancing these factors, this court finds that the state court's exclusion of the therapists' testimony was reasonable.  The state has a strong interest in protecting patient-therapist privilege.  The defense was permitted to present strong testimony about Walker's tendency to be untruthful from the two women who had raised her. It is entirely reasonable to conclude that a family member, one who has lived with and nurtured the witness and is willing to undermine the credibility of the witness, provided more than enough impeachment testimony.  Further, it is hard to conclude that testimony of a therapist who had only limited exposure to Walker and had not had contact with her for several years, would have been more compelling than that of Earle and George.  On balance, this Court finds that the trial court's exclusion of the expert testimony was neither contrary to, nor an unreasonable application of, clearly established law.

(3)    *Ineffective Assistance of Counsel*

Sherrors claims trial counsel was ineffective in failing to properly impeach Walker's testimony with the psychological reports, specific instances of dishonesty and presented expert testimony that would support the claim that Walker had difficulties being truthful.

As discussed above, Sherrors must show that counsel's performance fell below an objective standard of reasonableness, and that he was prejudiced as a result of counsel's defective performance.  *See Strickland*, 466 U.S. at 688, 694.  Sherrors has not shown that counsel's performance was defective.  First, defense counsel argued strenuously that the reports should be admissible and that Walker's waiver of privilege was knowing and voluntary. (Resp't

Lodgment 17, at 45-46, 82-89). He also argued that he should be permitted to ask about specific instances of dishonesty and theft. (*Id.* at 1582-83.) The trial court, however, ruled that these questions were not permitted. (*Id.* at 1583, 1599.) There is no indication that counsel did anything other than vigorously defend his client by attempting to introduce evidence concerning the reports.

Furthermore, defense counsel attempted to have expert testimony introduced to show that, due to her disability, Walker tended to make things up. (*Id.* at 137-38.) Finally, when the trial court ruled that neither the reports, instances of dishonesty, nor expert testimony would be permitted, defense counsel called two witnesses to testify to Walker's general tendency to be dishonest. Thus, Sherrors cannot show that trial counsel's performance fell below an objective standard of reasonableness.

In addition, defense counsel adequately cross-examined Walker. He pointed out inconsistencies in her testimony and attempted to show that she did not actually see some of the things to which she testified. He also had to make a tactical decision as to how forcefully to challenge Walker during cross-examination. At one side bar conference during the cross-examination of Walker, the judge noted that "[W]ith this particular witness, I don't think she understands, and as a consequence there's going to be a sympathy factor that develops, correctly or incorrectly, with the jury, and it works for both sides. So I'm not here to advise people on strategies. I'm just here to say I've already picked up on it." (Resp't Lodgment No. 17 at 1363.)

Even after the judge's comment, counsel continued to attempt to impeach Walker about inconsistent statements she made at the preliminary hearing. However, he focused on the more relevant inconsistencies. While counsel likely could have been more forceful in his cross-examination, he did not hold back when it came to important inconsistencies. Any decision to keep the tone of the cross-examination civil was assuredly a tactical one, to avoid alienating the jury be being perceived as overbearing on an obviously mentally challenged witness.

Sherrors has not overcome the presumption that his attorney exercised sound trial strategy. *Morris v. California*, 966 F.2d 448, 456 (9th Cir. 1991). Review of counsel's performance is "highly deferential" and there is a "strong presumption" that counsel rendered

adequate assistance and exercised reasonable professional judgment. *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1253 (9th Cir. 1987); *see Strickland v. Washington*, 466 U.S. at 690. The court need not determine the actual reason for an attorney's actions, as long as the act falls within the range of reasonable representation. *Id.* at 456-57. It does so here. Accordingly, defense counsel's performance did not fall below the objective standard of reasonableness. *See id.* at 688.

Accordingly, the state court's denial of his claim was neither contrary to, nor an unreasonable application of, clearly established law. Sherrors is not entitled to relief as to this claim.

**b.     Ground Six**

Sherrors claims his due process rights were violated because Trina Walker was permitted to testify despite her incompetency. He also argues his trial counsel was ineffective in failing to challenge Walker's competency under the California Code of Evidence § 701. Finally, he claims defense counsel should have cross-examined Walker about how she was affected by intoxication on the night of the murder. (*See* Pet. at 9C.)

*(1) Due Process*

Sherrors raised his due process claim in a petition for habeas corpus to the California Supreme Court and it was denied without comment or citation. Since that court did not furnish a basis for its denial of the claim, the Court must look through to the last reasoned decision to address this claim, the superior court order denying Sherrors habeas relief. *See Ylst*, 501 U.S. at 801-06. The superior court, however, did not address Sherrors' due process claim. Thus, this Court reviews the claim de novo. *Pirtle*, 313 F.3d at 1167 (9th Cir. 2002).

As discussed above, the trial court held a hearing to determine whether Walker's consent to the waiver of privilege to her psychiatric reports was voluntary. (*See* Resp't Lodgment No. 17 at 56-91.) After Walker and the other witnesses testified at the hearing, the trial court and attorneys from both sides discussed whether the waiver was valid. After Walker's testimony at the hearing, defense counsel raised the issue of whether Walker was competent to testify. (*Id.* at 64.) After hearing all the witnesses, and while the court was considering whether to allow the

reports to be admitted into evidence, the judge commented on the possibility that Walker might

be incompetent to testify – noting particularly that she seemed to answer any question posed in

the affirmative. (*Id.* at 87.) He asked both counsel for further briefing on the subject on whether

she was competent to testify. (*Id.* at 89.) During the discussion, the trial judge stated:

> COURT:   I'm also looking at the competency of a person who may be mentally and/or developmentally disabled. Now, that came out at the preliminary hearing, as I remember.
>
> In an endeavor to keep this as simple as possible, but with the real understanding that the real issue in this case might boil down to competency, shouldn't I be receiving points and authorities on that issue from counsel? Because this, to me, sort of is a subissue of that.

> [. . . .]

> COURT:   I don't know the extent of her retardation. *I know the extent to which she seems to go along with whoever the questioner is, as manifested in the preliminary hearing.* . . . So, I'm going to request some help from you gentlemen on that. I don't know whether the general rules on competency of witnesses apply to somebody in her particular stead, because I don't know the extent of her past problems and present problems.

> [. . . .]

> COURT:   Is she competent as a witness in this trial?

> [Prosecutor]: That's a separate issue form the one we were just talking about, I believe.

> COURT:   I think one is included in the other, though. If she isn't competent to testify, I'm not sure realistically that I could hold her competent to execute that waiver.

> COURT:   . . . Part of the manifestation, for example, is shown in her testimony at the preliminary hearing, where it seemed to me - - this is the subject of various views, and therefore susceptible to different arguments. *It seems to me that whoever was questioning her got the answers that that person wanted.*

> [Prosecutor]: Well, actually, Judge Kronberger commented on that, and it wasn't so much put in those terms. It was stated that when she was asked a leading question, the attorney who asked the leading question got what they wanted. But when she was asked open-ended questions, where the answer was not suggested, credible testimony was elicited.

> COURT:   I caught that. But then there's the realistic, pragmatic reality that on cross-examination leading questions is the rule.

[Prosecutor]: I agree.  That does not mean that she's not competent to testify. . .

(Resp't Lodgment No. 17 at 81-83, 86-87) (emphasis added.)

Due process may be violated if a court permits an incompetent witness to testify, but only if the state court's action rendered the trial fundamentally unfair.  *See Batchelor v. Cupp*, 693 F.2d 859, 865 (9th Cir. 1982).  Here, there was no indication that Walker was "incompetent" to testify.  California Code of Evidence section 701, states:

> (a) A person is disqualified to be a witness if he or she is:
>
> > (1) Incapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him; or
> >
> > (2) Incapable of understanding the duty of a witness to tell the truth.
>
> (b) In any proceeding held outside the presence of a jury, the court may reserve challenges to the competency of a witness until the conclusion of the direct examination of that witness

Cal. Evid. Code § 701.  This standard is consistent with the federal standard.  *See* Fed. R. Evid. 601.  Under the federal standard, every witness is presumed to be competent to testify unless it can be shown that the witness does not have personal knowledge of the matters about which he is to testify, that he does not have the capacity to recall, or that he does not understand the duty to testify truthfully.  *See United States v. Lightly*, 677 F.2d 1027, 1028 (4th Cir. 1982).  "There is no provision in the rules for the exclusion of testimony because a witness is mentally incompetent.  The question of competency goes to the issue of credibility, which is for the trier of fact."  *United States v. Hyson*, 721 F.2d 856 (1st Cir. 1983) (citing *United States v. Lightly*, 677 F.2d 1027, 1028 (4th Cir.1982); *United States v. Roach*, 590 F.2d 181, 185-86 (5th Cir.1979).)

Here, despite the judge's comments that she may be incompetent to testify, there is nothing to suggest Walker was incapable of understanding the oath, or incapable of expressing herself so as to be understood by the jury.  Further, Walker clearly had personal knowledge of highly relevant matters.  Accordingly, Walker was competent to testify.  The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established law.

1  *(2)      Ineffective Assistance of Counsel for Failing to Challenge Competency of Walker*

2         Sherrors claims that defense counsel was ineffective in failing to argue Walker was

3  incompetent under Cal. Evid. Code § 701.   He also claims counsel was ineffective in in failing

4  to appoint experts to testify to the affect Walker's admitted intoxication had on her ability to

5  observe and recollect.  (Pet. at 9C-9D.)

6         Sherrors raised his ineffective assistance of counsel claim in a petition for habeas corpus

7  to the California Supreme Court, which denied it without comment or citation.  Since that court

8  did not furnish a basis for its denial of the claim, the Court must look through to the last reasoned

9  decision to address this claim, the superior court order denying Sherrors habeas relief.  *See Ylst*,

10  501 U.S. at 801-06.  The court denied the claim, stating "Nothing in the record suggests that Ms.

11  Walker was incompetent to testify in this case.  In addition, as previously noted, her limitations

12  and reputation for dishonesty were disclosed to the jury."  (Resp't Lodgment No. 10 at 6.)

13         Again, the state court decision failed to cite to any federal law in denying the claim.

14  However, as the Supreme Court has noted, a state court need not cite Supreme Court precedent

15  when resolving a habeas corpus claim.  *Early*, 537 U.S. at 8. "[S]o long as neither the reasoning

16  nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court

17  decision will not be "contrary to" clearly established federal law.  *Id.*

18         As discussed above, under clearly established law, Sherrors must show that counsel's

19  performance fell below an objective standard of reasonableness, and that he was prejudiced as

20  a result of counsel's defective performance.  *See Strickland*, 466 U.S. at 688, 694.  Sherrors can

21  show that neither that counsel's performance was deficient, nor that he was prejudiced.

22         First, counsel *did* challenge Walker's competency after Walker's testimony at the hearing

23  regarding the waiver of privilege.  Counsel stated, "Your Honor, actually, what I would like to

24  do at this point is expand – I would like to make a motion under 402 that this witness is not

25  competent to testify before the jury."[16]  Soon thereafter, the prosecutor pointed out that the

26

27         [16] Cal. Evid. Code § 402 states:

28         (a) When the existence of a preliminary fact is disputed, its existence or nonexistence
           shall be determined as provided in this article.

-45-                                                                05cv1262

proper section for determining the competency of a witness was California Evidence Code section 701. (*Id.* at 84.)  After which, counsel for the defense argued Walker should be deemed incompetent under section 701, stating: "I would submit that understanding [the oath] and being able to relay it are also the issue.  You can be competent to understand the obligation of the oath, but if you're mentally incapable of relaying it or understanding what it is – well, I'll save that until after we file our points and authorities.  There's no reason to argue it right now." (*Id.* at 87-89.)

While there is nothing in the record to indicate that counsel did ultimately file points and authorities on the matter, that does not render his performance deficient because, as discussed above, there was nothing in the record to suggest Walker was incompetent under section 701. She was able to express herself clearly before the jury.  There was no indication that she did not understand the oath.  Although Walker sometimes had trouble understanding the questions, upon clarification, she was able to answer.

Petitioner does not allege Walker was unable to express herself clearly or incapable of understanding her duty to tell the truth.  He merely alleges that because of her mental disability, she had a tendency to exaggerate, or make things up.  This goes to her credibility and the weight of her testimony, not her competency.  *See United States v. Mills*, 597 U.S. 693 (9th Cir. 1079); *see also United States v. Phibbs*, 999 F.2d 1053 (6th Cir. 1993) (holding that witnesses were at least minimally capable of offering reliable evidence despite their psychiatric problems, and rather than excluding their testimony on grounds of incompetency, any possible weaknesses in their testimony went to its credibility, and so were to be assessed by the jury.)

Since any motion to have Walker deemed incompetent to testify would have failed, Petitioner cannot show trial counsel's actions were unreasonable.  *See Strickland*, 466 U.S. at

(b) The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests.

(c) A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute.

688.  Sherrors cannot show prejudice for the same reason.  *Id.* at 694.  Thus, the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established law.

>    *(3)     Ineffective Assistance of Counsel in Failing to Effectively Cross-Examine Walker Regarding Her Intoxication on the Night of the Murder And Failing to Call Expert Witness on Effect of Intoxication on Recollection*

Finally, Sherrors alleges counsel was ineffective in failing to cross-examine Walker about being intoxicated on the night of the murder.  He also claims counsel should have presented an expert witness to testify as to the effects of intoxication on the ability to observe and recollect.  (Pet. at 9C-9D).

Sherrors raised his ineffective assistance of counsel claim in a petition for habeas corpus to the California Supreme Court and it was denied without comment or citation.  (Resp't Lodgment Nos. 13 & 14.)  Since that court did not furnish a basis for its denial of the claim, the Court must look through to the last reasoned decision to address this claim.  *See Ylst*, 501 U.S. at 801-06.  However, Sherrors raised this claim for the first time in his petition for habeas corpus to the California Court of Appeal.  Court.  (Resp't Lodgment No. 11 at 4c.)  That court did not address this claim in its order denying the petition.  Thus, the Court must review this claim de novo.  *Pirtle*, 313 F.3d at 1167 (9th Cir. 2002).

As discussed above, under clearly established law, Sherrors must show that counsel's performance fell below an objective standard of reasonableness, and that he was prejudiced as a result of counsel's defective performance.  *See Strickland*, 466 U.S. at 688, 694.  Sherrors has shown neither that counsel's performance was deficient, nor that he was prejudiced.

Sherrors' claim that counsel failed to cross-examine Walker on her drinking and smoking of marijuana is belied by the record.  On cross-examination, Sherrors' attorney questioned Walker as follows:

> Q:     At what time do you recall being with Leticia Moore's apartment smoking pot that night?
>
> A:     I don't remember what time it was.  I just remember it was nighttime and we was hanging out.

Q:    So the night you say that you saw Ronnie come home with blood on his shirt and sneakers, do you recall what time it was that you first went to Leticia Moore's?

A:    I just remember it was late, like around ten o'clock or so.  It was dark outside.  So I don't remember.

Q:    Okay.  And were you also drinking beers that night with Leticia Moore?

A:    Yes, I was.

Q:    And do you remember how many beers you were drinking?

A:    Probably like about just two beers.

Q:    Okay.  And do you recall what kind of beers they were, the brand?

A:    Miller's Genuine Draft.

Q:    And do you recall how much pot you smoked?

A:    No, I don't.

(Resp't Lodgment at 1370-71.)

Thus, defense counsel elicited testimony that Walker had been drinking and likely smoking marijuana on the evening of the murder.  It was not unreasonable for defense counsel not to further question Walker regarding her intoxication and/or drug use.   Sherrors seems to argue that counsel should have gone further by asking Walker how her intoxication affected her.  However, Sherrors has not overcome the presumption that his attorney exercised sound trial strategy.  *See Morris v. California*, 966 F.2d 448, 456 (9th Cir. 1991).  Defense counsel may have made a tactical decision not to question her too vigorously if it was not necessary.   This is particularly true in light of the judge's comments, outside the presence of the jury, that the body language of some of the jurors seemed to suggest sympathy for Ms. Walker.  (*See* Resp't Lodgment No. 17 at 1363.)  Defense counsel got Walker to admit she had been drinking and smoked some marijuana on the night in question.  That was certainly enough for the jury, using its common sense, to make a determination on the extent, if any, her alcohol and drug use affected her observations and memory.

Review of counsel's performance is "highly deferential" and there is a "strong presumption" that counsel rendered adequate assistance and exercised reasonable professional

-48-

1   judgment.  *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1253 (9th Cir. 1987); *see*

2   *Strickland v. Washington*, 466 U.S. at 690.  The court need not determine the actual reason for

3   an attorney's actions, as long as the act falls within the range of reasonable representation.  *Id.*

4   at 456-57.  It does so here.  Accordingly, defense counsel's performance did not fall below the

5   objective standard of reasonableness.  *See id.* at 688.  Since Sherrors cannot show counsel's

6   performance was deficient, it is not necessary to discuss whether he was prejudiced.  *See*

7   *Strickland*, 466 U.S. at 697.

8   As for Sherrors' claim that counsel was ineffective in failing to call an expert on the

9   effects of marijuana and alcohol on Walker's ability to observe and recollect, Sherrors has not

10   shown prejudice.  The jury was capable of using its common sense in determining the effect

11   alcohol and marijuana may have had on Walker.  Even if expert testimony were deemed

12   admissible, Sherrors has not shown that there was a likelihood that the outcome would have been

13   different with the testimony.  Counsel introduced evidence of Walker's possible intoxication as

14   well as impeached her credibility in general.  There is no reasonable likelihood that the addition

15   of an expert to testify on a topic that jurors were capable of evaluating as lay people, would have

16   changed the outcome of the proceedings.  *See Strickland*, 466 U.S. 694.

17   In sum, the denial of Sherrors' ineffective assistance of counsel claims was neither

18   contrary to, nor an unreasonable application of clearly established law.

19   *(4)   Conclusion*

20   For the above reasons, the Court finds the state court's decisions on the three claims

21   raised in Ground Six were neither contrary to, nor an unreasonable application of, clearly

22   established law.  Therefore, the Court recommends the claims raised in Ground Six be denied.

23   *See Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254.

24   **c.   Ground Fourteen**

25   Sherrors asserts his due process rights were violated by the prosecution's failure to

26   acquire and disclose records related to Latrina Walker's psychiatric treatment and therapy.  He

27   claims these records contained information about Walker's tendency to lie and fabricate stories.

28   (Pet. at 9F.)

Sherrors raised this claim for the first and only time in his petition for habeas corpus to the California Supreme Court. It was denied without comment or citation. (Resp't Lodgment Nos. 13 & 14.)  Since this Court has a dispositive state court order which does not "furnish a basis for its reasoning," it must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado*, 223 F.3d at 982; *Himes*, 336 F.3d at 853.

In *Brady,* the Supreme Court held that "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Although this rule originally covered only exculpatory evidence, the Supreme Court has extended the *Brady* rule to include impeachment evidence as well. *United States v. Bagley*, 473 U.S. 667, 676 (1985)*.*

In order to establish a *Brady* violation, a defendant must show three things:  (1) the evidence must have been suppressed by the prosecution, either willfully or inadvertently, (2) the withheld evidence must be either exculpatory or impeachment material, and (3) the evidence must be material to the defense. *Benn v. Lambert*, 283 F.3d 1040, 1052-53 (9th Cir. 2002) (citing *Bagley*, 473 U.S. at 676, 678 and *United States v. Agurs*, 427 U.S. 97, 110 (1976).) "Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome of the trial." *Benn*, 283 F.3d at 1053 (citing *Bagley*, 473 U.S. at 676, *Agurs*, 427 U.S. at 111-12).  "Moreover, we analyze all of the suppressed evidence together, using the same type of analysis that we employ to determine prejudice in ineffective assistance of counsel cases." *Id*. (citing *Bagley*, 473 U.S. at 682 and *United States v. Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986).)

Here, Sherrors has not satisfied the first prong of the *Brady* requirements.  He points to nothing in the record to indicate that the prosecution suppressed evidence, willfully or not, regarding Walker's mental disabilities.  Indeed, the defense had access to a plethora of reports and medical records pertaining to Walker's disabilities.  (*See* Pet. at Attachment, Ex. A1-A8.) All of this information was reviewed by the trial court.  Ultimately, the trial court found that Walker's consent to give the defense access to her privileged medical files, was not knowing and

1  voluntary.  Thus, the trial court ruled that the defense could not introduce the reports into

2  evidence.  (Resp't Lodgment No. 17 at 1597-99.)

3       Second, except for the reports that the defense obtained, Sherrors has not shown that any

4  additional reports existed, much less that they would have been helpful in impeaching Walker's

5  testimony.  *See Benn*, 283 F.3d at 1053 (citing *Bagley*, 473 U.S. at 676, *Agurs*, 427 U.S. at

6  111-12).   Sherrors appears to argue that the prosecution should have taken it upon itself to

7  retrieve the same files that the defense had procured from state agencies that held them.

8  However, that would not have resolved the issue of privilege.

9       Finally, Sherrors has not shown prejudice.  Even if these reports existed, they would have

10  been subject to the same patient-psychotherapist privilege as the reports defense counsel

11  obtained.  Moreover, Sherrors offers nothing but his own speculation that any such reports would

12  have supported his claim that Walker's testimony was not credible given her disability.  Sherrors

13  also fails to show prejudice because testimony of Walker's disability and propensity to lie were

14  introduced at trial.  Both George and Earle, Walker's mother and aunt, each of whom had  cared

15  for Walker for significant periods of time, testified that she tended to "make things up" and could

16  not be trusted.  (Resp't Lodgment No. 17, at 1581, 1714.)  Walker herself admitted that she

17  suffered from a mental disability.  (*Id.* at 1362, 1364.)  Thus, even assuming such reports exist

18  and would have been admissible despite the doctor-patient privilege, Sherrors cannot succeeded

19  on this claim because he has not shown prejudice.  *See  Benn*, 283 F.3d at 1053 (citing *Bagley*,

20  473 U.S. at 682 and *United States v. Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986).)

21       Accordingly, after an independent review of the record, the Court concludes that Sherrors

22  has not satisfied the *Brady* requirements.  *See Brady,* 373 U.S. at 87.  Thus, Sherrors is not

23  entitled to relief as to this claim.

24       ***3.     Jury Selection***

25       **Ground Four:**

26       Sherrors claims that his right to due process, a fair and impartial jury and effective

27  assistance of counsel were violated when the Court and counsel failed to adequately question

28  potential jurors during voir dire and excuse or move to excuse specific jurors.  He also claims

1   jurors were biased because of the pre-trial publicity, race and class, and the jurors' own personal

2   experiences.  Sherrors also points to two jurors who he believes should have been removed

3   during voir dire.[17] (Pet. at 9C.)

4       Sherrors raised these claims in a petition for review of a habeas corpus filed in the

5   California Supreme Court, which denied them without citation of authority.  (*See* Lodgment No.

6   14.) Thus, this Court must "look through" to the last reasoned state court decision to address the

7   claim, the superior court opinion denying his habeas corpus petition, as the basis of its analysis.

8   *Ylst*, 501 U.S. at 801-06.

9       The court denied the claims, stating "Petitioner also purports to challenge the sufficiency

10  of voir dire regarding pretrial publicity and racial prejudice.  However, the examples cited do

11  not appear to involve either issue.  In addition, Petitioner mischaracterized these jurors'

12  responses and/or omitted relevant assurances that they could be fair and impartial." (Lodgment

13  No. 10 at 5.)  The court did not cite any legal authority for its decision.  (*Id.*)  However, as the

14  Supreme Court has noted, a state court need not cite Supreme Court precedent when resolving

15  a habeas corpus claim.  *Early*, 537 U.S. at 8.  "[S]o long as neither the reasoning nor the result

16  of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will

17  not be "contrary to" clearly established federal law.  *Id.*

18                  *(1)     Impartial Jury and Due Process*

19      It is clearly established that " [i]n all criminal prosecutions, the accused shall enjoy the

20  right to a speedy and public trial, by an impartial jury of the State and district wherein the crime

21  shall have been committed[.]"  U.S. Const. Amend. VI.  A state court defendant has a federal

22  constitutional right to an impartial jury.  *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir.

23  1986).  In the context of juror impartiality, due process means a juror capable and willing to a

24  decide a case solely on the evidence presented, and a trial judge who is careful to prevent

25  prejudicial occurrences.  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

26      In a habeas action regarding juror impartiality, the state court's finding of impartiality is

27

28      [17] In his state petitions for habeas corpus, Sherrors consistently raised a *Batson* claim.  However, even under liberal construction, Sherrors has not raised a *Batson* claim in this instant petition.

                                              -52-

1   a finding of fact that is accorded a presumption of correctness. *Wainwright v. Witt*, 469 U.S.

2   412, 429 (1985); *Patton v. Yount*, 467 U.S. 1025, 1036 (1984); *Smith v. Phillips*, 455 U.S. 209,

3   218 (1982). The overwhelming majority of claims of violations of the right to a fair and impartial

4   jury involve pretrial publicity, *see Irvin v. Dowd*, 366 U.S. 717 (1961), ex parte communications

5   with jurors, *see Turner v. Louisiana*, 379 U.S. 466 (1965), or the jury selection process. *See*

6   *Georgia v. McCollum*, 505 U.S. 42 (1992). However, "[t]he goal of the Sixth Amendment is

7   'jury impartiality with respect to both contestants.'" *McCollum*, 505 U.S. at 58 (quoting *Holland*

8   *v. Illinois*, 493 U.S. 474 (1990)). The Supreme Court has explained that "an impartial jury

9   consists of nothing more than 'jurors who will conscientiously apply the law and find the facts.'"

10  *Lockhart v. McCree*, 476 U.S. 162 (1986) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423

11  (1985)).

12      As for Sherrors' general complaint that jurors were biased by prejudicial publicity, the

13  trial court questioned the entire venire regarding pretrial publicity at the beginning of jury

14  selection. Specifically, the judge stated:

15          You'll note that I read to you that these events are alleged to have occurred
            back in September, the 30th of September, or on or about that date, of 1999. So
16          little time has passed since this incident or alleged incident occurred. But at the
            time of the incident, counsel reminded me that there was pretrial publicity in the
17          case. I believe it was carried in the local newspapers and on local television.

18          Very briefly, it involved finding the victim, Steven Foth, up in the Lake
            Hodges area in a pumpkin patch. And there were indications about Mr. Foth and
19          also about the defendants who are on trial and another individual who I'll be
            talking about in a few minutes. Anybody recall having read or heard anything
20          about this incident?

21  (Resp't Lodgment No. 18 at 24.) None of the potential jurors responded that they had seen

22  anything in the media about the case. The judge added that if, during the course of the

23  questioning, something came to mind that caused a potential juror to recall having read or heard

24  something about the case, then to let him know. (*Id.*) None did. And Sherrors points to nothing

25  else in the record to support his claim that any one of the jurors was biased due to pretrial

26  publicity.

27      Sherrors' case is nothing like *Irvin*, 366 U.S. at 727, one of the lead cases on pre-trial

28  publicity. In that case, the Supreme Court concluded that defendant was deprived an impartial

jury when eight of the 12 impaneled jurors stated that, due to pretrial publicity, they thought

defendant was guilty. *Id.* One juror had said that he could not give the defendant the benefit of

the doubt that he was innocent. Another stated that he had a "somewhat certain" fixed opinion

that the defendant was guilty. *Id.* at 728. Here, none of the jurors even admitted to hearing or

reading any pre-trial publicity, much less fixing a pre-conceived notion as to Sherrors guilt.

Thus, Sherrors cannot show that he was deprived of an impartial jury based on pretrial publicity.

Sherrors also complains, generally, that the jurors were biased by "racial and class

prejudice." (Pet.at 9C.) Sherrors' counsel, however, questioned the jury regarding racial bias,

stating:

> Now, obviously, Mr. Sherrors is African American. And we have to talk about that. Race is an issue in this country. Race has always been an issue in this country. And as the judge has already told you, Mr. Sherrors is entitled to a cross-section of the community, as Judge Kennedy said. People of different ethnic backgrounds, people of different colors, people of different socioeconomic groups that can look at the evidence and weigh the evidence fairly without giving any consideration to his color. Can everybody do that?
>
> The victim in this case is white. He's a young – he was a young, handsome, talented white male. Mr. Sherrors is a young poor, African American male.
>
> Does everyone promise Mr. Sherrors that those dynamics will not come into play when they go back and deliberate this case?
>
> Everyone seems to be shaking their head.

(Resp't Lodgment No.18 at 113.) No juror expressed any difficulty in being fair and impartial,

regardless of Sherrors race and/or socioeconomic background. (*Id.*) Thus, Sherrors has not

supported his general claim that the jurors were biased based on race and economic class.

The only specific complaints Sherrors has are related to two jurors  - Juror No. 5 and

Juror No. 10. He seems to argue that these jurors should have been excused for cause. Under

California law, challenges for cause are defined in Cal. Civ. Proc. Code § 225, which states:

> (1) A challenge for cause, for one of the following reasons:
>
> (A) General disqualification--that the juror is disqualified from serving in the action on trial.
>
> (B) Implied bias--as, when the existence of the facts as ascertained, in judgment of law disqualifies the juror.

> (C) Actual bias--the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party.

This standard is consistent with the federal standard.[18]

First, Sherrors argues that the court should have excused Juror No. 5 for cause. Juror No. 5's uncle had been murdered in 1985. The suspect was caught and the case tried in San Diego Superior Court, with the defendant being convicted. (Resp't Lodgment No. 18 at 182.) The Court inquired as follows:

BY THE COURT:

Q.     Were you able to hear the questions that the Court and counsel addressed to the other jurors yesterday and today?

A.     Yes.

Q.     Thinking back on those and without necessarily repeating them, do you recall any question that you would want to address or that you would answer differently from the lion's share of the jurors presently in the box?

A.     Not at this time.

Q:     Is there any reason that you know of why you could not sit as a fair an impartial juror in this case?

A:     No.

[ . . . .]

Q:     And I just want to find out, have you or any member of your family ever been the victim of a crime of violence like some of the ones that are charged in this case or others that are not charged?

A:     Yes, I have.  I - - I was raised by my uncle, who was murdered.  The case was heard in San Diego in front of Judge Gill.  The crime occurred in '85. It went to trial in 1990.

Q:     Was that because he was not apprehended until close to when the trial was rather than closer to the incident.

A:     Um, he was apprehended within six months of the crime but, ah, he, um, went through a couple of public defenders and wound up representing himself.  So - -

---

[18] "Challenges for cause are the means by which partial or biased jurors should be eliminated. To disqualify a juror for cause requires a showing of either actual or implied bias- that is ... bias in fact or bias conclusively presumed as a matter of law." *United States v. Gonzalez*, 214 F.3d 1109 (9th Cir. 2000).

Q:    Okay.

A:      - - there was a lot of - -

Q:    Did you attend the trial?

A:    I did.

Q:     And were you satisfied with the outcome and the performances of the various individuals during the trial?

A:    Yes, I was very pleased about it.

Q:    Anything about the police investigation of that case which may be on your mind.

A:    Only that they did an excellent job.

Q:    Okay.  Which, I guess, kind of leads me into – I didn't want to go through all these question and I don't intend to – if a police officer was called in this case – we've heard questions about your attitudes about officers about hearing their testimony.  Would they have a leg up in credibility in your mind as a result of your experience involving your uncle's case?  Not your uncle's case but the case in which you uncle was a victim?

A:    No. . . .

(Resp't Lodgment No 18 at 180-82.)

The trial judge then turned the questioning over to defense counsel.  Counsel asked Juror No. 5 if how she felt about the presumption of innocence and the criminal justice system in general.  She responded that she believed strongly in the presumption of innocence and that she thought, generally, the criminal justice system was fair.  She assured counsel that there was no reason why she could not be a fair and impartial juror.  (*Id.* at 184-186.)

The trial court did not err in failing to discharge Juror No. 5 for cause.  Juror No. 5 stated more than once that she could be fair and impartial.  There is nothing to suggest Juror No. 5 would not "conscientiously apply the law and find the facts.'"  *Lockhart*, 476 U.S. at 178.  Sherrors points to the fact that her uncle was murdered.  However, Juror No. 5 stated that her experience would not affect her ability to be fair and impartial.  It is notable, as well, that the murder of her uncle had happened 15 years prior.  There was simply no reason to disbelieve her statements that she could remain unbiased if selected as a juror.  She was honest and forthcoming about having a family member as a victim of murder, the same crime Sherrors was charged.  *See*

*Fields v. Brown*, 431 F.3d 1186, 1197 (9th Cir. 2005) (holding that juror who was honest and forthcoming was not impliedly biased despite having wife had been a victim of crimes similar to those charged against defendant); *cf. Gonzalez*, 214 F.3d at 1114 (9th Cir. 2000)

As for Juror 10, Sherrors claims she should not have been permitted to sit as a juror because she had worked in law enforcement, had friends and family in law enforcement. Sherrors claims she stated was "unsure if her law enforcement connections would affect her impartiality." Sherrors also claims she indicated she would deem someone who was merely present at a crime scene, an accomplice. Finally, Sherrors states she had had a personal experience with domestic abuse. (Pet. at 9C.)

As the state court noted in denying this claim, Sherrors has mischaracterized Juror 10's testimony and taken statements out of context. Juror No. 10, a kindergarten teacher, stated that 15 years prior, she had worked at with the Fresno County Sheriff's department in their crime lab. She also stated that she had done a year internship as a federal probation and parole officer. (Resp't Lodgment No. 18 at 247.) She also admitted that she had two cousins and a friend who all worked as correctional officers, and a friend who was married to an ATF officer. (*Id.* at 247-48.) When questioned by the court, she stated that she could be fair, regardless of her ties to law enforcement. (*Id.* at 248-49.)

When questioned by the prosecutor, Juror No. 10 mentioned that, as a kindergarten teacher, she sometimes dealt with "accomplices" – with regard to a fight or some other infraction. She stated that, as a teacher, she had to listen to all who were there and involved, to determine what happened. She stated, in part:

Q:      . . . I know you refer to your kindergartners as accomplices, right?

A:      Yes.

Q:      I never heard a kindergartner referred to as an accomplice. What do you mean by that?

A:      I meant that sometimes people that were also involved, you have to use them, you have to listen to what they're saying, because they were there. They too were there. And you weigh that with all the other people that were or were not there, but now what happened or heard.

Q:      Okay. Now, do you view the statement of a kindergartner accomplice the same as you would any other person?

A:    I view by definition what an accomplice is.

Q:    Pardon me?

A:    I said I view the same definition.  Maybe it's applied differently - - not applied.  What I consider an accomplice is - - maybe a fight takes place on campus, like they're in my room, somebody was involved.  I think I would also think of a person who was involved in there as the same, regardless of whether they were 5 or 25 or what it was.  But in a playground situation or in a robbery situation, an accomplice somebody who was there or had a part or was a witness of, but was there . . . and involved in some way.

Q:    Involved in the crime at the crime scene, right?

A:    They may not have been the principal person, but they were there.

[. . . .]

Q:    But obviously we're dealing with a murder case and you will have an accomplice who was there at the crime scene involved in some respect in that crime, and you will hear about the involvement of that accomplice, right? We talked a little bit about labels and some jurors have talked about, for example, be suspicious of the testimony of an accomplice.

        What I need to know from you, is when that witness gets on the stand, when an accomplice gets on the stand, are you automatically going to say, you know, "This person was there at the crime scene. They were involved in this. I don't care what they have to say, I'm just not going to listen to them"? Would you do that.

A:    No.

Q:    Okay. Would you consider the surrounding circumstances and all the other evidence in the case to determine if that person is telling the truth.

A:    Yes, I would.

Q:    And you would observe their demeanor to see how they're acting while they testify to see if you believe them?

A:    Yes, I would.

(*Id.* at 268-70.)

        Reading the statements in context, it is clear that Juror No. 10 did *not* think that anyone who was merely present during a crime was an accomplice. She stated that an accomplice was someone who was "involved" somehow in the crime. There is nothing in the exchange regarding accomplices that suggests Juror No. 10 could not be fair and impartial. She stated she

-58-

05cv1262

would not automatically discredit accomplice testimony, rather she assured the prosecutor that she would evaluate the accomplice testimony to determine its credibility. Thus, there is no reason to believe she would be biased against Sherrors.[19]

Finally, Sherrors' statement that Juror No. 10 had "personal experience with domestic abuse" is inaccurate. Juror No. 10 stated that she had a co-worker who was in an abusive marriage fifteen or sixteen years prior. (*Id.* at 271.) When asked, she described the person as merely a co-worker, not a friend. Furthermore, she did not talk to her very often about her situation. (*Id.*) Again, there is nothing about this testimony that suggests Juror No. 10 could not be fair and impartial. There was no basis for which to discharge her for cause. As such, Sherrors cannot show that the jurors at his trial would not " conscientiously apply the law and find the facts." *Lockhart*, 476 U.S. at 178.

In sum, Sherrors has not shown that he was denied an impartial jury based on pretrial publicity and racial and socioeconomic bias. Moreover, he has not shown that the two jurors he points to specifically were incapable or unwilling to " conscientiously apply the law and find the facts." *Id.* Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established law.

*(2)      Ineffective Assistance of Counsel*

Sherrors also argues that his counsel was ineffective in failing to thoroughly voir dire potential jurors and failing to use peremptory challenges to remove Jurors No. 5 and 10 from the jury.

It has long been recognized that "[peremptory challenges] are auxiliary; unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension. *United States v. Martinez-Salazar*, 528 U.S. 304 (2000) (citing *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988); *see Stilson v. United States*, 250 U.S. 583, 586 (1919) ("There is nothing in the Constitution of the United States which requires the Congress to grant peremptory challenges."). In California, a peremptory challenge to a juror may be

---

[19] If anything, her testimony regarding accomplices tended to disfavor the prosecution since the prosecution case relied heavily on the credibility of the testimony of Lena Hixon, an accomplice.

exercised for no reason at all.  (*See* Cal. Code Civ. Pro. § 231; *but see Batson v. Kentucky*, 476 U.S. 79 (1986) (holding that jurors may not be challenged on the basis of their race).

To prevail under *Strickland*, 466 U.S. 668, Sherrors must show that his "counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id*. at 687.  There could be any number of tactical reasons why defense counsel would have wanted Juror Nos. 5 and 10 on the jury, but whether counsel had a strategic reason or not is immaterial, because Sherrors was not prejudiced. *Id.* at 697 (observing that a court may determine prejudice without first deciding deficiency).  As discussed above, prejudice exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  Here there is no such reasonable probability, because, as discussed above, neither juror was biased.

Furthermore, as discussed above, the jury was adequately questioned about pre-trial publicity and racial biases.  There is no indication that any impaneled juror was biased by publicity or racial bias, or any other reason.  Thus, again, Sherrors has not shown prejudice.

Accordingly, the state court's decision was neither contrary to nor an unreasonable application of clearly established law.

### (3)   Conclusion

For the above reasons, the Court finds the state court's decisions on the two claims raised in Ground Four were neither contrary to, nor an unreasonable application of, clearly established law.  Therefore, the Court recommends the claims raised in Ground Six be denied. *See Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254.

### 4.   DNA Evidence

Sherrors raises two claims related to DNA evidence.  First, he argues his due process rights were violated when the prosecutor committed misconduct by distorting the DNA evidence during closing argument.  Next, he argues that this due process rights were violated when the state's experts consumed the entire sample of DNA, precluding the defense from testing the evidence with its own expert.  He also claims defense counsel was ineffective in failing to move for dismissal due to the consumption of DNA evidence.

**a.**  **Ground Eleven:**

Sherrors argues that his due process rights were violated when the prosecutor improperly argued that DNA evidence found at the crime scene proved Sherrors' guilt. (Pet. at 9E.) Sherrors raised this claim his petition for review of his direct appeal to the California Supreme Court. (*See* Resp't Lodgment No. 5.)   The petition was denied without comment or citation.  (*See* Resp't Lodgment No. 7.)  Thus, this Court must "look through" to the last reasoned state court decision to address the claim, appellate court's opinion on direct review.  *See Ylst*, 501 U.S. at 801-06. In denying this claim, the court stated:

> The defendants also contend that the prosecutor committed misconduct during his closing argument by misstating that Sherrors's DNA was on the watch found at the scene of the murder.  In making a closing argument, a prosecutor is given "wide latitude" and may engage in vigorous advocacy so long his or her summation amounts to a fair comment on the evidence, including the inferences that may reasonably be drawn therefrom. (*People v. Williams* (1997) 16 Cal .4th 153, 221; *People v. Hill* (1998) 17 Cal.4th 800, 819.)  In reviewing a challenge to the propriety of the prosecutor's comments to the jury, the paramount question is whether there is a reasonable likelihood that the jury construed or applied the challenged comments in an objectionable fashion. (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

> At trial, prosecution witness Brian Burritt testified that he tested three small areas of the watch, two of which appeared from a visual inspection to have blood (but only one of which tested positive for the presence of blood), and determined that Sherrors, Hall and Hixon could be excluded, but that Foth could not be excluded, as the source of the DNA found in those areas. Burritt also testified, however, that the area on the back of the watch face showed a trace result consistent with Sherrors's DNA and that the result could indicate Sherrors was a secondary source of that DNA, although it was "extremely weak" and he was "not comfortable" relying on it as a basis for determining whether Sherrors was such a secondary source.

> In his closing argument, the prosecutor did not argue that Burritt's testimony established Sherrors's ownership of the watch, but instead cited to the testimony of Sherrors's sister for that purpose.  Sherrors's counsel responded by arguing that the DNA testing would have resulted in a mixture of DNA if the watch was Sherrors's and that thus the DNA testing conclusively established that the watch had belonged to Foth, not to Sherrors.  In rebuttal, the prosecutor addressed the defense argument by summarizing the witness testimony that the watch belonged to Sherrors and did not belong to Foth and citing Burritt's uncontradicted testimony that the DNA evidence was inconclusive on whether Foth was the "habitual wearer" of the watch.

> In the portion of argument that the defendants now challenge, the prosecutor also referred to Burritt's testimony about the trace DNA on the back of the watch, arguing that the trace DNA came from a source other than Foth.  After the trial court overruled a defense objection, the prosecutor argued that the trace DNA was consistent with Sherrors's DNA, that Sherrors was the source of the trace DNA and that the reason Sherrors's DNA was on the watch was because it was his watch.

-61-

1       The prosecutor's argument regarding the state of the DNA evidence from
2    the watch was, in large part, a fair summation of Burritt's trial testimony.  Burritt
     testified that the trace result was an allele that was consistent with Sherrors's DNA
3    and could indicate that Sherrors was a secondary source of the DNA from the back
     of the watch face, although it was too weak to permit him to give a conclusive
4    opinion on the subject.  Sherrors now argues that the trace result was not sufficient
     to implicate him as a source of the DNA "as a matter of science" based on other
5    aspects of the DNA testing results.  However, this argument appears to be
     contradicted by Burritt's testimony that the result could indicate that Sherrors was
6    a secondary source; further, Sherrors does not cite to any expert testimony in the
     record to support his assertion.  In light of Burritt's testimony, the prosecutor was
     entitled to argue that the DNA on the watch was Sherrors's.

7
8       Further, even if we assume that Burritt's testimony was too equivocal to
     support the prosecutor's argument, we would nonetheless conclude that there was
9    no prosecutorial misconduct. The prosecutor's brief rebuttal argument regarding
     the trace DNA evidence was not an egregious misstatement of the evidence and it
10   did not constitute a pattern of misbehavior. (*See People v. Frye* (1998) 18 Cal.4th
     894, 979 [a single instance of error during closing argument generally will not
11   establish a pattern of egregious behavior sufficient to constitute misconduct].) In
     addition, in light of Sherrors's counsel's arguments that the DNA evidence
12   conclusively excluded Sherrors as a source of the DNA and that the prosecution's
     characterization of Burritt's testimony was "totally and completely disingenuous
13   and intellectually dishonest," it is not reasonably likely that the jury was confused
     or misled by the prosecutor's characterization of the trace DNA evidence.  The
     prosecutor's argument does not establish a basis for reversal of the judgment.

14
15   (Resp't Lodgment No. 10 at 16-18.)

16     It is clearly established that, a prosecutor commits misconduct during closing argument

17   when he or she manipulates or misstates the evidence presented during the trial.  *Darden v.*

18   *Wainwright*, 477 U.S. 168, 181-82 (1986). However, a prosecutor may argue reasonable

19   inferences based on the evidence.  *See Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986);

20   *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991). "Counsel are given latitude in the

21   presentation of their closing arguments, and courts must allow the prosecution to strike hard

22   blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*,

23   97 F.3d 1246, 1253-54 (9th Cir. 1996) (quoting *United States v. Baker*, 10 F.3d 1374, 1415 (9th

24   Cir. 1993).)

25     The ownership of the watch was hotly disputed.  The prosecution submitted that Sherrors

26   was the owner/wearer of the watch, while it was the defense's position that the watch was Foth's.

27   In arguing this point during closing, as the appellate court stated, the prosecutor did not mention

28   Burritt's testimony regarding the trace DNA on the watch.  Instead, he argued that Trina Walker's

1    testimony proved the watch found at the crime scene was Sherrors'.  (Resp't Lodgment No. 17

2    at 1729-30.)  He also noted that Hixon had testified that after leaving the crime scene, Sherrors

3    had said "Man, I can't find my watch."  (*Id.* at 1730.)

4          In defense co-counsel's closing, he argued that the DNA regarding the watch tended to

5    show that Foth, not Sherrors, was the wearer of the watch.  He stated in part:

6          We had Brian Burritt.  He was the DNA guy who attempted to link the
     watch to Mr. Sherrors. I submit that his testimony was suspect at best.  He couldn't
7    say one way or the other that any DNA was found on this – actually, he could say
     that there was no DNA linked to Sherrors on this watch, and that there was some
8    DNA extracted from this watch, from the back of the watch, that was linked to Mr.
     Foth.  He could not rule out that Mr. Foth may have been the habitual wearer of the
9    watch.  So I don't know that he adds a whole lot to this case.

10   (*Id.* at 1746.)

11         Then Sherrors' counsel addressed the watch in his closing, stating initially, "[Hixon]

12   testified that the watch was Ronnie Sherrors'.  The San Diego Police Department's own crime

13   lab excluded Ronnie Sherrors as the habitual wearer of the watch."  (*Id.* at 1782.)  He later

14   returned to the issue, arguing:

15         The watch found at the crime scene is not Ronnie Sherrors' watch.  The
     watch found at the crime scene was Mr. Foth's watch. . . . .Now, Brian Burritt
16   testified that he – and remember when I cross examined him on his rough notes:
     You were specifically trying to get habitual wearer DNA evidence from the watch,
17   right?

18   "Yes"

19   "And you went about it by taking a swab from the cover plate, the back of the
     watch?"
20
           I see some of you wearing watches.  It's the back of the watch which comes
21   into contact with your wrist.  Why?  Because that's where the epithelial cells are,
     the skin cells on the surface which rub off on the back of the watch.  So when you
22   swab it, the swab will capture the those cells, and from those cells are extracted
     DNA, and from the DNA a profile is obtained.
23
           Now, from the back of the cover plate where there was no blood – and this
24   whole idea, the prosecution's whole approach to the testimony of Brian Burritt was
     totally and completely disingenuous and intellectually dishonest.  It was designed
25   to confuse you.  It was designed to blow smoke in from of this clear and
     uncontroverted evidence.  There was no blood on the back of the cover plate where
26   Brian Burritt took that swab, no invisible blood, no thin layer of blood, no blood.

27         Now, as a result of that DNA testing Ronnie Sherrors was excluded as the
     genetic donor of the DNA on the back of the watch.  That's it.  Now, there was no
28   mixture.  There was no mixture of DNA. . . .

Steven Foth could not be excluded as the genetic donor of an unmixed genetic profile on both the stained and unstained portion of the watch.  This DNA evidence puts to rest once and for all who the habitual wearer of the watch is.  There's no mixture.  This watch belonged to Steven Foth, and Ronnnie Sherrors is excluded by state-of-the-art forensic DNA evidence.

(Resp't Lodgment No. 17 at 1820-21, 23.)

Finally, when it came time for the prosecution's rebuttal argument, the prosecutor spent a good deal of time pointing to witness testimony that the watch found at the scene did not belong to Foth.  Several of Foth's friends who had seen him on the day of his death testified that Foth did not own such a watch.  (*Id.* at 1884-85.)  Finally, the prosecutor addressed the defense's assertions that the DNA showed that the watch belonged to Foth, and not Sherrors.

[Prosecutor]:    Then we get to the DNA results that were discussed, that defense counsel relies on to establish that that is the watch that belonged to Mr. Foth.  Well, you heard the testimony from Brian Burritt.  There is–from the swabbing on the back of the watch, item 4A, in the DQ-Alpha, DQA1 section here, there is a trace 2.  You've heard this testimony.

Now, when you look at Mr. Foth, the's a 1.2 and a 1.3.  Where did that 2 come from?  It came from another source.  There is another source of DNA on the back of the watch.

Mr. Wadler:  I'm going to object.  That misstates the testimony, your Honor.

The Court:  Overruled.

[Prosecutor]:    Trace 2, People's 22.  This is the testimony that's in this case, trace 2.  We look at Ronnie Sherrors, and what does he have in the DQA1 section?  He has a 2.  There's another source of DNA on that watch , and the reason is because it was Mr. Sherrors' watch.  He was wearing that watch.

(*Id.* at 1890-91.)  Sherrors now claims the prosecutor committed misconduct with this statement, by mischaracterizing Burritt's testimony.

Burritt's testimony regarding the trace DNA evidence on the watch was equivocal.  Burritt testified, in relevant part:

Q:    Okay. I'm not sure we described all the areas [of the watch that were tested].  There was 4A, which was where?

A:    4A was the back of the watch face, the side opposite where the dials are that's in contact with the arm, the wrist.

-64-

05cv1262

Q:     What was the test result [for the presence of blood]?

A:     Negative.

                        [. . . .]

Q:     But can you interpret those [DNA] results [from the watch] for us?

A:     Yes.  Well, I tested three – three areas of the watch and I also tested reference samples from Steven Foth, Ronnie Sherrors, Willard Hall and Lena Hixon, and I actually did not do the testing for Jimmie Washington. That was done at a later time.  And what these reference samples are is these are just samples of known DNA that were collected from these people for comparison purposes.

       For all three areas of the watch that I tested Steven Foth could not be excluded as the source of DNA obtained from these three different areas. *And Ronnie Sherrors, Willard Hall,  and Lena Hixon were excluded as the sources of DNA that I obtained from these three areas of the watch.*

                        [. . . .]

Q:     Okay. And what were the population frequencies with respect to the typing of Mr. Foth.

A:     . . .[F]or Caucasians it's approximately 1 in 3,200 people. . ..
                        · · · ·

Q:     Now, when you swabbed the back of the watch, why was it that you were even doing this testing to begin with?

A:     Well, my intent was to try to obtain DNA from the wearer of the watch.  So I swabbed an area that – even though I didn't see any bloodstains, I went ahead and swabbed that area.

Q:     Now, how does one's DNA get on the back of a watch?

A:     That would most likely be on there if you're the wearer of the watch.  It would be on there from DNA that's in sweat, the cells that come out through our sweat pores that would end up on the watch.
                        [. . . .]

Q:     Okay.  Then in the results for 4A [the sample taken from the back of the watch] there also, in the DQA1 locus – let's just talk about those columns. There's six columns, correct?

A:     Yes.

Q:     What does each column represent.

A:     Each column is a different test that I performed.  It's a different region of the DNA that we're looking at.  They're six independent regions we're testing.

Q:     Okay.  Now, with respect to the DQA1 locus, which is in the first column there, in the 4A item there is a result that says "trace 2"; is that correct?

                        -65-                                    05cv1262

1  A:  Yes.

2  Q:  What does that mean?

3  A:  That means there was a very weak signal for the 2 allele, the 2 type that I
        detected.

4
   Q:  Okay.  Now, does Mr. Foth have a 2 allele in the DQ-Alpha-1 locus?
5
   A:  No, he does not.
6
   Q:  Does Ronnie Sherrors?
7
   A:  Yes, he does.
8

9  (Resp't Lodgment No. 339-41, 344-45.)

10      On cross-examination, Burritt admitted that because the signal was so weak, he could not

11 make a conclusive statement as to whether Sherrors DNA was present in the sample.  This is

12 consistent with his report, which specifically stated that "no interpretation is provided for trace

13 results."  (*See id.* at 348.)  Burritt stated that Sherrors was "certainly excluded as to the vast

14 majority of the DNA on 4A, and if he was there on 4A he would have to be at such a low level

15 that I'm not comfortable making that conclusion whether he's there or not and we just don't – I

16 try not to even go there.  I don't give those interpretations in my report."  (*Id.*)

17      In light of Burritt's equivocal testimony, the state court's denial of Sherrors claim was

18 reasonable.  Although at one point Burritt stated that Sherrors was excluded as a possible source,

19 he then testified that because of the trace 2, he could not definitively exclude Sherrors as being

20 a contributor of the trace DNA.  When taken in context, the prosecutor's argument during rebuttal

21 was simply pointing out that the trace 2 result on the back of the watch was consistent with the

22 testimony of Foth's friends, that the watch did not belong to Foth; and with Trina Walker, who

23 stated the watch was Sherrors'.  This is not a misstatement or manipulation of the evidence, but

24 rather a reasonable inference based on all the evidence.  *See Darden*, 477 U.S. at 181-82; *United

25 States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).

26      Accordingly, the state court's denial of this claim was neither contrary to, nor an

27 unreasonable application of, clearly established law and therefore should be denied.  *See

28 Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254.

**b.     Ground Five:**

Sherrors claims his right to due process was violated because the prosecution experts consumed the certain samples of DNA, thus precluding the defense an opportunity to have its own expert conduct DNA testing.  He also claims trial counsel was ineffective in failing to move for dismissal under "*Youngblood v. Arizona*" and failing to call an expert in support of the claim. (Pet. at 9C.)

Sherrors raised these claims in a petition for review of a habeas corpus filed in the California Supreme Court, which denied them without citation of authority.  (*See* Lodgment No. 14.)  Thus, this Court must "look through" to the last reasoned state court decision to address the claim, the superior court opinion denying his habeas corpus petition, as the basis of its analysis. *Ylst*, 501 U.S. at 801-06.

The court denied the claim, stating:

> The record provided for the Court does not support these claims.  First, Petitioner's attorney did seek exclusion of the DNA evidence at issue (CT 415 *et, seq.*  Although the motion was based on *Prince v. Sup.Ct.* (1992) 8 Cal. App.4th 1176 rather than *Arizona v. Youngblood* (1988) 488 U.S. 51, the record does not establish that Petitioner's counsel was ineffective in relying on the *Prince* decision.

> If material evidence is destroyed, a defendant may seek sanctions under *California v. Trombetta* (1984) 467 U.S. 479 and *Arizona v. Youngblood*, (1988) 488 U.S. 51.  However, one of the requirements of such a motion is that the prosecution acted in bad faith in destroying the it.  Nothing in the record establishes that this evidence was destroyed in bad faith.

> Furthermore, whether this evidence had been destroyed, i.e., tested by prosecution experts in a manner that precluded defense testing, was disputed and this dispute was to be decided by the jury. (RT 141-144.) The trial court indicated its intent to entertain a renewal of the motion brought on Petitioner's behalf following the jury's resolution of the issue. (RT 144.) However, Petitioner failed to submit ay subsequent proceedings [sic] or the Court's review.

(Resp't Lodgment No. 10 at 5-6.)

*(1)     Due Process*

Sherrors claims the prosecution experts consumed samples of DNA extracted from two cigarette butts found in the Audi. As a result, he argues, the defense an did not have an opportunity to have its own expert conduct DNA testing.

Under clearly established law, the prosecution has a duty not to destroy material evidence. *California v. Trombetta*, 467 U.S. 479, 488 (1984).  Material evidence is evidence that might be

expected to play a significant role in the suspect's defense.  It must possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.  *Id.* at 489. A defendant must show the police acted in bad faith in failing to preserve potentially useful evidence.  *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  The presence or absence of bad faith turns on the whether the police had knowledge of the exculpatory value of the evidence at the time it was destroyed.  *Id*. at 56 n.*; *see California v. Trombetta*, 467 U.S. 479, 489 (1984).

As an initial matter, Sherrors' claim fails because he cannot even establish evidence had been destroyed.  As the state court noted, the question of whether the samples were "consumed" and thus not able to be tested by defense experts, was a matter of great dispute.  (*See* Resp't Lodgment No. 17 at 40-44. The defense expert Dr. Edward Blake, reported that he could not conduct testing on the cigarette butts because a prosecution expert consumed the entire sample. (*See* Respt's Lodgment 15 at 439-443)  He reported that the ends of both butts which contact the lips during smoking, were cut off laterally on the diameter, instead of "longitudinally" along the length."  *Id.* at 440.  However, it was the prosecution's position that the samples were not consumed and still capable of testing.  (Resp't Lodgment No. 141-142, *see also* Resp't Lodgment No. 15 at 117-25.)  For this reason, the judge decided to leave the decision of whether there was a sample or not, for the jury to decide when the time came.  (Resp't Lodgment No. 17 at 144.) When Blake testified, there was no mention of the "consumed" evidence.  It seems the defense decided not to pursue that strategy.  (Resp't Lodgment No. 17 at 1513-46.)

Even assuming the evidence was consumed during testing, Sherrors alleges nothing to show  the prosecution experts acted in bad faith. Although Dr. Blake reported that cutting the cigarettes on the diameter was not the normal procedure, there is nothing else in the record to support the allegation that this was done in bad faith to consume the sample. Finally, Sherrors provides nothing to show that the evidence he seeks would have been exculpatory.

For the above reasons, the state court's decision was neither contrary to, nor an unreasonable application of clearly established law.

1

*(2)     Ineffective Assistance of Counsel*

2       Sherrors also claims counsel was ineffective in failing to object to the introduction of the

3 DNA evidence under "*Youngblood v. Arizona*" and failing to call an expert in support of the

4 claim.  As discussed above, to prevail under *Strickland*, Sherrors must show that his "counsel's

5 performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at

6 687, 694.  As discussed above, defense counsel did attempt to exclude the DNA evidence

7 related to the cigarette butts.  Thus, Sherrors has not shown counsel's performance was deficient.

8 *Id.* at 688.     Furthermore, he has not shown prejudice because, as discussed above, his claim

9 lacked merit.   *Id.* at 694.)

10       As to counsel's purported failure to call an expert as to this claim, counsel *did* call Dr.

11 Blake to testify as to other DNA testing.  (*See* Resp't Lodgment No. 17 at 1513-62.)  That he did

12 not testify as to whether the sample was consumed or not was likely as strategic one, given that

13 there was nothing to indicate that, even if there was a testable sample, the result would have been

14 different.  Sherrors has not overcome the presumption that his attorney exercised sound trial

15 strategy. *Morris v. California*, 966 F.2d at 456.  The court need not determine the actual reason

16 for an attorney's actions, as long as the act falls within the range of reasonable representation.

17 *Id.* at 456-57.  It does so here.   Therefore, Sherrors cannot show denial of his effective assistance

18 of counsel claim was contrary to, nor an unreasonable application of, clearly establish law.

19

*(3)     Conclusion*

20       For the reasons discussed above, the state courts' denials of the claims presented in

21 Ground 5 were neither contrary to, nor an unreasonable application of, clearly established law.

22 Thus, the Court recommends they be denied.  *See Williams*, 529 U.S. at 412-13; 28 U.S.C. §

23 2254.

24       **5.     *Other Jury Instructions***

25           **a.     Ground Seven:**

26       In Ground Seven, Petitioner argues his right to due process, a jury trial and effective

27 assistance of counsel were violated when the trial court improperly instructed the jury with regard

28 to the special circumstance allegation.  He claims the court erroneously instructed the jury that

1  it could find the special circumstance allegation true if the jury found the killing took place while

2  "a" defendant (rather than "the" defendant) was engaged in a robbery.  Sherrors claims trial

3  counsel was ineffective because he failed to seek a curative instruction.  (Pet. at 9D.)

4                              *(1)     Due Process and Right to Jury Trial*

5        Sherrors raised the substantive aspect of this claim in his petition for review of his direct

6  appeal to the California Supreme Court.  (*See* Resp't Lodgment No. 5.)  The petition was denied

7  without comment or citation.  (*See* Resp't Lodgment No. 7.)  Thus, this Court must "look

8  through" to the last reasoned state court decision to address the claim, appellate court's opinion

9  on direct review.  *See Ylst*, 501 U.S. at 801-06.

10       In denying Sherrors'[20] claim, the appellate court stated:

> Penal Code section 190.2 imposes a sentence of death or life imprisonment without the possibility of parole where the defendant is found guilty of first degree murder committed while the defendant was engaged in or an accomplice to specified felonies, including robbery. (*Id.*, subd. (a)(17).) This special circumstance is distinguishable from the felony-murder rule in that it requires that the defendant "commit[ ] the act resulting in death in order to advance an independent felonious purpose" (*People v. Bonin* (1989) 47 Cal.3d 808, 850), whereas the felony-murder rule requires only that the killing occur during the commission or attempted commission of the underlying felony (here, robbery). (*People v. Bolden* (2002) 29 Cal.4th 515, 554; *People v. Williams* (1994) 30 Cal.App.4th 1758, 1762.)

> The special circumstance instruction, CALJIC No. 8.81.17, informs the jury that in order for the special circumstance allegation to be true, the prosecutor must prove: "[1a. The murder was committed while [**the**] [a] defendant was [engaged in] [**or**] [**was an accomplice**] in the [commission] ... of a [robbery]] ... [and] [2. The murder was committed in order to carry out or advance the commission of the crime of [robbery] or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the ... [robbery] was merely incidental to the commission of the murder.]" (Boldface added.)

> Here, the special circumstance instruction read to the jury referred in paragraph 1a to "a" defendant and omitted any reference to accomplice liability (as boldfaced above), defects that Hall contends render the modified instruction fatally flawed. He contends that the omission of the reference to accomplice liability, combined with the limitation of the jury's consideration to whether "a" defendant rather than "the" defendant was engaged in robbery, essentially invited the jury to find a special circumstance based on a simple felony-murder finding and that the jury was not required to find that Hall was engaged in or was an accomplice to the robbery.

---

[20]  The opinion refers to this as Hall's claim.  However, Sherrors' joined Hall's argument on appeal.  (*See* Resp't Lodgment No. 1 at 66.)

1    We need not reach the issue of whether the instruction as given was fatally
2  flawed because in any event Hall cannot demonstrate prejudice from the asserted
   instructional error since " 'the factual question posed by the omitted instruction was
3  necessarily resolved adversely to defendant under other, properly given
   instructions.' " (*People v. Pulido* (1997) 15 Cal.4th 713, 726-727.) Here, the court
4  instructed that the use of the word "defendant" in the instructions referred to each
   defendant unless otherwise specified and that the jury could not find the
   robbery-murder special-circumstance allegation true unless the particular defendant
5  was engaged in the robbery at the time of the killing. (*See* CALJIC Nos. 1.11,
   8.80.1 (1997 rev.).)
6
7    Pursuant to these instructions, the jury was required, as a condition of
   finding the special circumstance allegation true as to Hall, to find that he was
8  engaged in the robbery at the time Foth was killed, in addition to finding that he
   was an actual killer, an aider and abettor in the murder who acted with the intent
9  to kill or an aider and abettor and major participant in the robbery who acted with
   reckless indifference to human life. These instructions thus required the precise
10 findings that Hall contends were omitted as a result of the modification of CALJIC
   No. 8.81.17 and thus any error in modifying the latter instruction was harmless.

11   Having found that there was no reversible error here, we nonetheless feel
12 compelled to note that instructional problems similar to those that occurred here
   happen all too often in criminal cases. We urge counsel and the trial courts to spend
13 a bit more time preparing and reviewing proposed instructions so that any such
   problems can be identified and remedied before submission to the jury. In light of
14 the public resources involved in trying (and potentially, retrying) defendants in a
   case such as this, the amount of time that would be required to take preventive
15 steps is de minimis and well justified.

16 (Resp't Lodgment No. 4 at 12-14) (emphasis in original).

17    As discussed above, to the extent Petitioner claims the jury instructions were incorrect

18 under state law, his claim is not cognizable on federal habeas review. *Estelle* , 502 U.S. at 71-72.

19 Clearly established law provides that a petitioner must show the instructional error so infected

20 the entire trial that the resulting conviction violated due process. *Id.* at 72; *Henderson*, 431 U.S.

21 at 154.  The allegedly erroneous instruction must be considered in the context of the trial record

22 and the instructions as a whole. *Estelle*, 502 U.S. at 72. The instructions must be more than just

23 erroneous. Sherrors must show that there was a reasonable likelihood that in light of the

24 instructions as a whole, the jury applied the challenged instruction in such a way that his

25 constitutional rights were violated. *See Carriger*, 971 F.2d at 334.

26    Here, the instruction erroneously stated that the special circumstance enhancement for

27 Sherrors could be found true if the jury found the murder of Foth was committed while **"a**

28 defendant was [engaged in] [**or**] in the [commission] ... of a [robbery]]." (*See* Resp't Lodgment

-71-                                            05cv1262

1    No. 15 at 276.)  As the state court noted, the instruction should have referred to "the" defendant.

2    The instruction should have stated that the defendant was engaged in *or was an accomplice* in the

3    commission of a robbery."  Cal. Penal Code § 190.2.  Thus, the jury could have found the special

4    circumstance allegation to be true with respect to Sherrors if it found that the murder was

5    committed while his co-defendant was engaged in robbery.

6         In finding any error harmless, the state court pointed, in part, to CALJIC No. 1.11.  The

7    court instructed the jury as follows: "The word 'defendant' applies to each defendant *unless you*

8    *are instructed otherwise*." CALJIC No. 1.11 (emphasis added).   This additional instruction,

9    however, does not help here because under the erroneous modified version of CALJIC 8.81.17,

10   jury *was* instructed otherwise.  The jury was specifically instructed it could find the special

11   circumstance true if "a," defendant committed the murder during the course of a robbery.  By

12   using the article "a" the instruction clearly indicates the that the jury could find the circumstance

13   true if either Hall or Sherrors were engaged in a robbery, when in fact, the law requires the

14   instruction to apply *the* named defendant who is the subject of that particular instruction.

15        Although the Court of Appeal's reference to CALJIC No. 1.11 does nothing to cure the

16   instructional defect here, this Court must still decide whether the erroneous instruction so infected

17   the trial as to render Sherrors' conviction fundamentally unfair.  In doing so, the Court looks to

18   the other instruction cited by the court of appeal, CALJIC No. 8.80.1.  Under that instruction, the

19   jury was advised that

20             [I]f you found a defendant in this case guilty of murder of the first degree,
             you must determine if the following special circumstance is true or not true: The
21        murder of Steven Foth was committed by the defendant while the defendant was
             engaged in the commission or attempted commission of the crime of robbery, in
22        violation of Penal Code section 211 within the meaning of Penal Code section
             190.2 . . .

23

24   (Resp't Lodgment No. 15 at 274.)

25        The above instruction is partially correct.  It refers to "the" defendant.  Although it does

26   not mention accomplice liability, it is irrelevant because the jury *did* find that both defendants

27   committed murder during the course of a robbery.  The special verdict form indicates that the

28   jury found that "the murder of STEVEN FOTH was committed by defendant RONNIE

-72-                                                           05cv1262

JERMAINE SHERRORS while the said defendant was engaged in the commission and attempted commission of the crime of Robbery. . .” Thus, the jurors found the special circumstance true as to Sherrors individually. (*Id.* at 300.) The error contained in the modified CALJIC No. 8.81.17 did not prejudice Sherrors. There is no reasonable likelihood that, in light of the instructions as a whole, the jury applied the challenged instruction in such a way that his constitutional rights were violated.[21] *See Carriger*, 971 F.2d at 334.

Therefore, Sherrors due process rights were not violated. *See Estelle*, 502 U.S. at 72. The state court's denial of this claim was neither contrary to, nor an unreasonable application of clearly established law.

### (2)    *Ineffective Assistance of Counsel*

Sherrors also claims counsel was ineffective in failing to request a curative instruction to the Modified CALJIC 8.81.17. Sherrors raised this in his petition for writ of habeas corpus to the California Supreme Court, and it was denied without comment. (*See* Lodgment No. 14.) Thus, this Court must "look through" to the last reasoned state court decision to address the claim, the superior court opinion denying his habeas corpus petition, as the basis of its analysis. *Ylst*, 501 U.S. at 801-06.        In denying the claim, the court stated:

> Although the instruction was found to be deficient in the abstract, the error was determined to be harmless since 'the factual question posed by the omitted instruction was necessarily resolved adversely to defendant under other, properly given instructions'. . . .the failure of Petitioner's claim on the merits precludes an ineffective assistance of counsel claim on that basis'"

(Resp't Lodgment No. 10 at 6-7.)

The state court's denial of this claim is consistent with *Strickland*. There is no need to consider whether counsel's performance was deficient under *Strickland* because, as discussed above, Sherrors cannot show prejudice. "There is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### (3)    *Conclusion*

---

[21]    In addition, given the jury's finding that Sherrors committed the murder during the commission of a robbery or attempted robbery, Sherrors cannot show the instructional error had a substantially injurious affect on the verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

05cv1262

For the reasons discussed above, the state courts' denials of the claims presented in Ground 7 were neither contrary to, nor an unreasonable application of, clearly established law. Thus, the Court recommends they be denied. *See Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254.

**b.  Ground Eight**:

Sherrors claims the special verdict form provided to the jurors was defective because it only required the jury to find that he committed the murder during the course of a robbery – omitting the requirement that it be found that he committed the murder to facilitate a robbery. He also claims trial counsel was ineffective in failing to seek a corrective instruction or correct the verdict forms. (Pet. at 9D.)

As noted above, the trial court provided the jury with a special verdict form which stated:

> We, the jury in the above entitled cause, find the special circumstance that the murder of STEVEN FOTH was committed by defendant RONNIE JERMAINE SHERRORS while the said defendant was engaged in the commission and the attempted commission of the crime of Robbery, in violation of Penal Code sections 211 or 212.5, within the meaning of Penal code section 190.2(a)(17).

(Resp't Lodgment No. 15 at 300.)

*(1)     Due Process*

Sherrors argues the form omitted an essential element of the special circumstances allegation because, under Penal Code section 190.2(a)(17), a jury must find (1) that the murder was committed while a defendant was engaged in the commission or attempted commission of a robbery *and* (2) the murder was committed in order to carry out or advance the commission of the crime of Robbery or to facilitate the escape therefrom or to avoid detection. Sherrors claims the error amounted to a violation of his due process rights. He claims his due process rights were therefore violated.

Sherrors raised the substantive aspect of this claim in his petition for review of his direct appeal to the California Supreme Court. (*See* Resp't Lodgment No. 5.) The petition was denied without comment or citation. (*See* Resp't Lodgment No. 7.) Thus, this Court must "look through" to the last reasoned state court decision to address the claim, appellate court's opinion on direct review. *See Ylst*, 501 U.S. at 801-06.

In denying Sherrors'[22] claim, the appellate court stated:

> Hall contends that the felony murder special circumstance verdict form was defective because it only required the jury to make a finding that he committed Foth's murder during the commission of a robbery, but omitted the requisite finding that he committed the murder to advance the commission of the robbery or to facilitate escape therefrom or avoid detection. Hall argues that this error was prejudicial because when taken in conjunction with the prosecutor's closing argument, the verdict form would convince the jury that there was no distinction between first degree felony murder and the felony-murder special circumstance.

> In light of the fact that the special verdict form was incomplete rather than an inaccurate statement of the law, it is not clear whether Hall properly preserved this issue for appellate review as he did not raise any objection to the special verdict form in the proceedings below. However, even if we reach the merits of Hall's argument, we nonetheless reject his contention that the incompleteness of the special verdict form constitutes reversible error.

> In criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to and governing the case. (*People v. Roberge* (2003) 29 Cal.4th 979, 988.) In accordance with this principle, it certainly is preferable that the elements of a special circumstance allegation be completely stated in the special verdict submitted to the jury, although there is a split of authority on whether the omission of an enhancement element from the verdict form is error. (*Compare People v. Chevalier* (1997) 60 Cal.App.4th 507, 513-516; *People v. Garcia* (1992) 3 Cal.App.4th 582, 586.)

> Even if we assume, however, that it was error for the court to give the jury a correct but incomplete special verdict form, any such error was harmless. (*See People v. Wims*, supra, 10 Cal.4th at p. 314 [generally, a judgment may be overturned for an instructional error relating to special sentencing allegations only if it is reasonably probable the defendant would have received a more favorable result in the absence of the error]; *compare People v. Sengpadychith* (2001) 26 Cal.4th 316, 325-326 [failure to instruct on an element of a non-strike sentence enhancement provision that increases the penalty for the underlying crime "beyond the 'prescribed statutory maximum' "is reversible unless harmless beyond a reasonable doubt].)

> Hall admits the court properly instructed the jury that the special circumstance allegation required a finding that he committed the murder to advance the commission of the robbery. He nonetheless argues that the improper special verdict form-when coupled with the prosecutor's passing comment that although the special circumstance allegation required a finding that the murder was committed during the robbery, "it's the same elements basically" as those required for felony murder-rises to the level of prejudicial error. However, in light of the propriety of the court's instruction regarding the omitted element and its general admonition that the jury must follow the instructions rather than counsel's arguments regarding the applicable law, we conclude it is not reasonably likely that the jury was misled by the incomplete special verdict form.

(Resp't Lodgment No. 4 at 18-20.)

---

[22] The opinion refers to this as Hall's claim. However, again, Sherrors' joined Hall's argument on appeal. (*See* Resp't Lodgment No. 1 at 66.)

Although a special verdict form is not a jury instruction, if the defective form so infected the entire trial that the resulting conviction violated due process, Sherrors may be entitled to relief. *See Estelle*, 502 at 72; *Henderson*, 431 U.S. at 154. This must be considered in the context of the trial record and the instructions as a whole. *Estelle*, 502 U.S. at 72. Unless Sherrors can show that there was a reasonable likelihood that the verdict form was so defective his constitutional rights were violated, he is not entitled to relief. *See Carriger*, 971 F.2d at 334.

The verdict form was both incomplete and inaccurate. It omitted an entire element of the robbery special circumstance. Indeed, as it was presented on the form, it was simply the definition of first degree felony murder with robbery. When the jury entered "true" on the verdict form, it is unclear if it was doing so based on the wording on the special verdict form, or the actual jury instruction – which, as discussed above, was also erroneous for another reason.

The errors were compounded by the prosecutor's statement during closing argument, that the special circumstance was essentially the same as the felony murder instruction. This is incorrect. The prosecutor stated:

> So, have we proven each and every element of felony murder beyond a reasonable doubt, all three, including robbery or attempted commission of the robbery. . . .Now, the special circumstances does require that you find the murder was committed during the commission or attempted commission of a robbery, and it's basically the same elements that I just described to you. So, I won't rehash all that and go through the elements of robbery and so forth. We've proven that whoever committed this crime did so with the intent or during the commission of committing a robbery. So we've proven that.

(Resp't Lodgment No. 17 at 1723, 1725.) The prosecutor later highlighted the incomplete instruction, stating that only the first element must be found true. (*Id.* at 1741.)

Contrary to the prosecutor's argument, the special circumstance requires something that felony murder does not. There are two elements to the special circumstance instruction: The first element reads: "The murder was committed while [the] defendant was [engaged in] [or] [was an accomplice] in the [commission] ... of a [robbery]].[23]   (*See* Resp't Lodgment No. 15 at 276.) This is where the special verdict form left off. And this is presumably what the prosecutor was

---

[23] The special verdict form did not suffer the same deficiency as the first portion of the special circumstance instruction because Sherrors' name was inserted where "a defendant" appeared the jury instruction.

1  referring to.

2      But there is also a second element, which was omitted entirely from the special verdict

3  form, and not mentioned by the prosecutor during closing, that requires the jury find that "the

4  murder was committed *in order to carry out or advance the commission* of the crime of [robbery]

5  *or to facilitate the escape* therefrom *or to avoid detection*. (*See* Respt's Lodgment No. 15 at 276,

6  CALJIC No. 8.81.17) (emphasis added). In other words, the special circumstance referred to in

7  these instructions is not established if the robbery was merely incidental to the commission of the

8  murder.

9      Looking to the instructions as a whole, however, the jury did receive the proper instruction

10  as to the second element of the special circumstance under CALJIC No. 8.81.17. While is true

11  that the court erred in instructing the jury on the first element of the special circumstance, the

12  second element was a correct statement of the law. (*See id.*) Thus, while there are problems with

13  both the instructions and the special verdict form related to the special circumstance allegation,

14  the Court finds that, when viewing the instructions as a whole, the error was not such that it so

15  infected the trial that as to violate Sherrors' due process rights. Accordingly, the state court's

16  denial of this claim was neither contrary to, nor an unreasonable application of, clearly

17  established law.

18                          *(2)     Ineffective Assistance of Counsel*

19      Sherrors also claims counsel was ineffective in failing to correct the defective special

20  verdict form. Sherrors raised this in his petition for writ of habeas corpus to the California

21  Supreme Court, and it was denied without comment. (*See* Lodgment No. 14.) Thus, this Court

22  must "look through" to the last reasoned state court decision to address the claim, the superior

23  court opinion denying his habeas corpus petition, as the basis of its analysis. *Ylst*, 501 U.S. at

24  801-06.

25      In denying the claim, the court stated:

26          Petitioner contends the verdict forms were defective and that his attorney
     failed to seek their correction. The sufficiency of the verdict form was also raised
27     by Hall on appeal. The Court of Appeal found any error harmless. This
     determination applies equally to Petitioner and precludes any prejudice resulting
28     from his attorney's failure to seek the correction of the form.

                                        -77-                              05cv1262

1   (Resp't Lodgment No. 10 at 7.)

2         As discussed above, to prevail under *Strickland*, 466 U.S. 668, Sherrors must show that

3   his "counsel's performance was deficient" and "that the deficient performance prejudiced the

4   defense." *Id*. at 687.   Here, the court need not address whether counsel's performance was

5   deficient because Sherrors has not shown prejudice.  Given the discussion above, there is no

6   reasonable likelihood that the result would have been different had the verdict form been

7   accurate. *See id.*

8                *(3)*    *Conclusion*

9         For the reasons discussed above, the state courts' denials of the claims presented in

10   Ground 8 were neither contrary to, nor an unreasonable application of, clearly established law.

11   Thus, the Court recommends they be denied. *See Williams*, 529 U.S. at 412-13; 28 U.S.C. §

12   2254.

13           **c.**    **Ground Nine**:

14         Sherrors alleges his he was denied due process and the right to a fair trial when the trial

15   court instructed the jury on a modified version of CALJIC No. 2.15.  He argues that the faulty

16   instruction effectively lessened the prosecution's standard of proof by permitting the jury to find

17   him guilty upon the mere conclusion that he was in possession of stolen property, namely, the

18   Audi.   He also claims counsel was ineffective in failing to object to the instruction. (Pet. at 9D.)

19         The trial court instructed the jury pursuant to CALJIC No. 2.15, as follows:

20             If you find that a defendant was in possession of recently stolen property,
     the fact of that possession is not by itself sufficient to prove an inference that the
21      defendant is guilty of the crime of murder. Before guilt may be inferred, there must
     be corroborating evidence tending to prove a defendant's guilt.  However, this
22      corroborating evidence need only be slight and need not by itself be sufficient to
     warrant an inference of guilt.
23

     As corroboration, you may consider the attributes of possession, time, place, and manner;
24      that the defendant had an opportunity to commit the crime charged; the defendant's
     conduct; his false or contradictory statement, if any; and other statements that may have
25      been made with reference to the property.

26   (Resp't Lodgment No. 15 at 233.)

27   Sherrors argues this instruction violated his due process rights because it "lightened" the

28   prosecutor's burden of proof.  (Pet. at 9D.)

1    Sherrors raised this claim in his Petition for review to the California Supreme Court and

2    it was denied without comment.  (*See* Lodgment No. 14.)  Thus, this Court must "look through"

3    to the last reasoned state court decision to address the claim, the superior court opinion denying

4    his habeas corpus petition, as the basis of its analysis.  *Ylst*, 501 U.S. at 801-06.

5    In denying Sherrors' claim, the appellate court stated:

6    Hall contends, and Sherrors joins in the contention, that the trial court erred
     in instructing the jury with the modified instruction, arguing that corroborated
7    evidence that he possessed property recently stolen from Foth supports only an
     inference that he committed theft, but does not permit an inference that he was
8    guilty of murder.

9    The California Supreme Court's recent decision in *People v. Prieto* (2003)
     30 Cal.4th 226 (*Prieto*) holds that CALJIC No. 2.15 is inapplicable to nontheft
10   offenses, including murder. (*Prieto*, at pp. 248-249, *citing People v. Barker*, *supra*,
     91 Cal.App.4th at p. 1176.)  Although the Attorney General suggests that the
11   analysis of *Prieto* does not apply in cases "where the murder is directly and
     causally related to and emanating from the same facts as the theft offense and the
12   only issue is identity," the unequivocal language of *Prieto* does not support such
     a conclusion.  Further, in light of the jury's special circumstance robbery-murder
13   finding in *Prieto*, the opinion cannot be read as holding that the fact the murder
     emanates from the same facts as the theft renders its analysis inapplicable.  In
14   accordance with *Prieto*, we conclude that the court erred in instructing the jury
     with CALJIC No. 2.15.

15
     The question then becomes whether the error is prejudicial, i.e., whether it
16   is reasonably likely the jury would have reached a different result if the court had
     not given the instruction. (*Prieto*, *supra*, 30 Cal.4th at p. 249.)  We answer this
17   question in the negative.  CALJIC No. 2.15 specifically instructed the jurors that
     they could not infer guilt of murder from the defendants' possession of recently
18   stolen property absent corroborating evidence of guilt.  The inference of guilt
     addressed in CALJIC No. 2.15 is permissive, not mandatory, and thus the jury was
19   entitled to credit, or reject, the inference based on its evaluation of the evidence.
     (*People v. Anderson* (1989) 210 Cal.App.3d 414, 430.)  The court also instructed
20   the jury on the elements of murder, felony murder and the special circumstance of
     murder during the commission of a robbery, and told the jurors that the prosecution
21   had to prove these elements and the special circumstance beyond a reasonable
     doubt.  Most notably, the jury's special circumstance finding that the defendants
22   committed the murder during the commission of a robbery makes clear that the jury
     accepted the substance of Hixon's testimony regarding the defendants'
23   involvement in the incident.  Based on the jury's acceptance of Hixon's testimony,
     there is no reasonable likelihood that it would have rendered a verdict more
24   favorable to the defendants had the court omitted this instruction.

25
     (Resp't Lodgment No. 4 at 10-12.)

26
27   As discussed above, to the extent Petitioner claims the jury instructions were incorrect

     under state law, his claim is not cognizable on federal habeas review.  *Estelle*, 502 U.S. at 71-72
28
     (1991).  To merit relief, clearly established law provides that a petitioner must show the

                                        -79-                                    05cv1262

1  instructional error so infected the entire trial that the resulting conviction violated due process.

2  *Id.* at 72;.   The allegedly erroneous instruction must be considered in the context of the trial

3  record and the instructions as a whole.  *Id.*  at 72; *Kibbe*, 431 U.S. at 156; *Cupp*, 414 U.S. at

4  146-47.  The instructions must be more than just erroneous, Sherrors must show that there was

5  a reasonable likelihood that in light of the instructions as a whole, the jury applied the challenged

6  instruction in such a way that his constitutional rights were violated.  *See Carriger v. Lewis*, 971

7  F.2d 329, 334 (9th Cir. 1992) (en banc).

8        An instruction that requires the jury to infer a finding, shifting the burden of proof from

9  the prosecutor to defendant, violates a defendant's due process rights.  *See Carella v. California*,

10  491 U.S. 263, 265 (1989). However, where that inference is permissive, the instruction may be

11  constitutionally sound. *Ulster County Court v. Allen*, 442 U.S. 140, 157 (1979).

12        The inference that a jury can draw from CALJIC No. 2.15 is a permissive one, neither

13  required by the mere possession of stolen property nor mandated by the existence of other

14  corroborating factors such as proximity to the crime scene, opportunity to commit the crime, or

15  subsequent conduct.  *Schwendeman v. Wallenstein*, 971 F.2d 313, 316 (9th Cir.1992).

16        When the inference is permissive, allowing the jury to infer an essential fact from proof

17  of another fact is lawful so long as "the inferred fact is more likely than not to flow from the

18  proved fact on which it is made to depend." *Id.*, (citations and internal quotations omitted).  In

19  *Preito*, the California Supreme Court held that "'proof that a defendant was in conscious

20  possession of recently stolen property simply does not lead naturally and logically to the

21  conclusion the defendant committed' a rape or murder."  30 Cal. 4th 226, 248-49.

22        Similarly, the inferred fact here, Foth's murder, is *not* more likely than not to flow from

23  mere possession of Audi. *See Schwendeman*, 971 F.2d at 316 (stating that "we cannot say with

24  substantial assurance that the inferred fact of reckless driving more likely than not flowed from

25  the proved fact of excessive speed.")  Thus, the instruction was "constitutionally deficient."  *See*

26  *Id.*, citing *Ulster County*, 442 U.S. at 166 n.28.  The instruction violated Sherrors' due process

27  rights.  *Id.*

28        Having found error, the Court must now look to the state court's decision that the error

-80-

was harmless. There are two standards applied by California Courts in determining whether an error is harmless. The standard set forth in *People v. Watson*, 46 Cal.2d 818 (1956), is applied in reviewing "non-constitutional magnitude, trial type errors." *See Bains v. Cambra*, 204 F.3d 964, 971 n.2 (9th Cir. 2000). Under *Watson*, the court must determine whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." *Watson*, 46 Cal.2d at 836. The clearly established federal standard set forth in *Chapman v. California*, 386 U.S. 18 (1967) is applied in reviewing errors of constitutional magnitude. Under *Chapman*, the court must determine whether the error was "harmless beyond a reasonable doubt." *Id.* at 24.

In this case, the court of appeal determined that the error in instructing the jury as to the modified CALJIC No. 2.15 was not "reasonably likely the jury would have reached a different result if the court had not given the instruction." (Resp't Lodgment No. 4 at 11.) Thus, state court did not find the error to be of constitutional magnitude and thus applied the harmless error the standard set forth in *People v. Watson*, 46 Cal.2d 818 (1956). *See Bains v. Cambra*, 204 F.3d 964, 971 (9th Cir. 2000) (finding that, "by applying the *Watson* harmless error standard rather than the *Chapman* standard, [the state court] impliedly found the [error] was not of constitutional magnitude.") Although the state court of appeal found error, it "failed to select the appropriate standard in evaluating the harmlessness of [that] error[]." *Id.* at 975.

Since the state court failed apply *Chapman*, along with its more stringent standard, to the constitutional instructional error, its decision amounted to an unreasonable application of clearly established law. *See Bains v. Cambra*,  204 F.3d 964, 971 (9th Cir. 2000); *see also Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254.

The Court must now decide whether the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). *See Bains,* 204 F.3d at 977 (holding that the federal court "should apply the *Brecht* standard when conducting their own independent harmless error review, regardless of what, if any, type of harmless error review was conducted by the state court."); *see also Hanna v. Riveland*, 87 F.3d 1034, 1039 (9th Cir. 1996). If a reviewing court is in "grave

1   doubt" as to whether the error had such an effect, the petitioner is entitled to the writ. *Coleman*

2   *v. Calderon*, 210 F.3d 1047, 1051 (9th Cir. 2000).

3       In determining whether there was *Brecht* error, a judge must consider, "'Do I, the judge,

4   think that the error substantially influenced the jury's decision?'" *O'Neal v. McAninch*, 513 U.S.

5   432, 436 (1995). If a federal habeas judge is in "grave doubt" about whether a constitutional trial

6   error "had substantial and injurious effect or influence in determining the jury's verdict," the error

7   is not harmless and "the petitioner must win." *O'Neal*, 513 U.S. at 436, 445. "By 'grave doubt'

8   we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual

9   equipoise as to the harmlessness of the error." *Id.* at 435.

10      Here, the Court has "grave doubt." The Court, having reviewed all the evidence presented

11  at trial, cannot say that the instruction did not have a substantial and injurious effect on the

12  verdict.

13      First, the prosecution's case relied overwhelmingly on the testimony of Lena Hixon, an

14  accomplice whose statements under oath were, at times, simply unbelievable. She admitted to

15  having lied numerous times about the identity of the murderers and the circumstances of the

16  incident. Her story was constantly changing. She first told detectives that the killers were Benny

17  Wilson and Terrence Smallgreen. (Resp't Lodgment No. 17 at 1007, 1020.) Then she said it was

18  Hall and Sherrors. (*Id.* at 1021.) She told detectives that Foth approached her for rock cocaine,

19  but she told Kathrine Davis that he approached her for sex. (*Id.* at 1025.) Testing done at the San

20  Diego crime lab revealed the presence of semen on Foth's right thigh. She also testified that the

21  shirt found at the crime scene was Sherrors', (*Id.* at 1033, 1075, 1147, 1273-75) but DNA testing

22  eliminated Sherrors (as well as Hall and Hixon) as the habitual wearer of the shirt. (*Id.* at 1524.)

23      Hixon first denied stabbing Foth. (*Id.* at 1020.) But then, after being pressed by

24  detectives, stated that she had stabbed Foth one time, because Sherrors forced her to. (*Id.* at 965,

25  1130-32.) To Davis, however, she described stabbing Foth, holding her shirt over the knife to

26  avoid leaving fingerprints. (*Id.* at 1612-23.) Davis testified that Hixon had told her she was

27  surprised at how the knife felt going into the body. (*Id.* at 1613.) In addition, Hixon testified that

28  she lost her fingernail when Sherrors shook her after she first got out of the car when they arrived

1   at the pumpkin patch.  (*Id.* at 970.)  However, Davis testified that Hixon told her that she must

2   have lost her fingernail while she was holding the victim down, or helping drag the body.  (*Id.*

3   at 1610-11.)

4       Hixon denied ever seeing or using Foth's cell phone (*id.* at 1036) but phone records

5   showed that days after the murder she used the phone to call one of her customers after he paged

6   her.  (*Id.* at 1036, 1671.)  She testified that she never saw, took or touched any of the victim's

7   property (*id.* at 1036), but the victim's ATM card was found in her purse and her fingerprints

8   were on it, along with other items from the car. (*Id.* at 1567.)  She claimed she did not see the

9   Audi again after Hall and Sherrors dropped her off the night of the murder.  (*Id.* at 1041.)  Others

10  testified, however, that they saw her in or around the car several times in the days after the

11  murder.  (*Id.* at 861, 868, 1185-86, 1189.)

12      Her testimony on the stand was often in direct conflict with other, more objective evidence

13  presented at trial.  According to Hixon's testimony, the entire incident, from the time she was

14  approached by Foth, drove to meet Sherrors and Hall, drove from City Heights to Lake Hodges,

15  stabbed Foth 83 times, hid the body and drove back down the interstate to the AM/PM, took place

16  in well over an hour and a half.  (*See id.* at 944-977.)  However, her story is simply

17  incompatible evidence that Foth's last cellphone conversation with Horne took place at 6:50 and

18  the first failed attempt to use the ATM card was only 46 minutes later.  (*See id.* at 227, 231-32,

19  1283, 714-17.)  Even assuming that Hixon was a poor estimator of time, it is nearly impossible

20  to believe that the murder she described could have taken place in that short of a time period.[24]

21  Given Hixon's often incredible testimony, it is hard for this Court to credit much of anything she

22  said.

23

---

24      [24]  The appellate court was asked to take judicial notice that the distance from 4699 Wightman
        Street (where Hixon testified that Sherrors and Hall picked up Foth) to University Avenue is 1.24 miles.
25      The I-15 University Avenue ramp to Pomerado Road is 21.78 miles and it is another .39 miles from the
        exit to the pumpkin patch where the body was found.  In order to get back to the freeway from the
26      murder scene, it is another .58 mile (with a stop sign and a traffic light).  From the on-ramp of I-15 south
        to the Mira Mesa Boulevard exit is 10.11 miles, and it is another .43 miles from there to the AM/PM
27      where the attempt was made to use the ATM card.  This distance also included traffic signals. (*See*
        Resp't Lodgment No. 2 at 59-60 n.31.) After considering driving time, there seems little time left for
28      Hixon to bring Foth to Wightman from the taco shop, to wait for Hall and Sherrors to return after
        leaving with Foth (with Foth now in the trunk), stab Foth 83 times, disrobe Foth and throw his body
        over a fence.

1    Other than Hixon's weak performance on the stand, the jury was left with very little to tie

2 Sherrors to the murder of Foth.  There was no authoritative physical evidence.  Indeed, evidence

3 found at the scene, such as the bloody shirt, the Gatorade bottle, the shoe print, size 8 shoes, could

4 not be tied to Sherrors or his co-defendant.[25]  (*Id.* at 431-32, 679-80,1462-63, 1513-16,1521-25.)

5 Although Burritt testified as to "trace" DNA on the watch, his testimony was so equivocal as to

6 add nothing to the prosecution's assertions about the watch belonging to Sherrors.  (*Id.* at 339-41,

7 344-45.)

8    This leaves the testimony of Trina Walker, Sherrors' mentally disabled sister.  She stated

9 that she recognized the watch found at the scene as Sherrors'.  She also stated that when her

10 returned to the apartment that evening, she saw blood on his shirt and his shoes, as if he had

11 stepped in something all over the front and side of his shoes.  (*Id.* at 1348, 1375.)  Although

12 Walker described the shoes as covered in blood, luminol testing of the areas where Walker stated

13 she saw Sherrors standing in the bloody shoes, was negative for blood.  (*Id.* at 1465-66, 1469-71,

14 1480-82.)   Moreover, her testimony was also subject to harsh impeachment.  Her own family

15 members testified that she could not be believed.  (*Id.* at 1581, 1714.)

16    Given the equivocal evidence tying Sherrors to the murder itself, the erroneous instruction

17 that permitted the jury to infer his guilt based upon his possession of the Audi, upon only "slight"

18 corroboration leaves this Court in grave doubt about its affect on the outcome of the trial.  This

19 is all the more true because, while the evidence tying Sherrors to the murder was based on

20 questionable testimony, the evidence that he was in possession of the Audi in the days after the

21 murder was strong.  Several witnesses, with no interest or bias, testified that they saw Sherrors

22 and Hall in or near the car during those days.  (*See* Resp't Lodgement No. 17 at 752; 861.)  And

23 the car was parked in the alley outside the apartment where the two were staying.  Most

24 importantly, Sherrors' DNA was found on cigarette butts found inside the Audi.  Thus, the jury

25

26 _____

27    [25]  Both Sherrors and Hall wore size 13 shoes.  (Resp't Lodgment No. 17 at 608-09, 616.)
Prosecution expert Melvin Kong originally testified that the shoe print was about 12 1/2 inches long,

28 corresponding to a man's size 12 to 13 1/2.  However, on cross-examination, Kong admitted that his
rough notes indicated that the length of the print was 28.5 centimeters, which would convert to a man's
shoe size of 7 to 8 1/2.  (*Id.* at 612-616.)

1  had strong, almost indisputable evidence that Sherrors was in possession of stolen property.[26]  It

2  is impossible to say that, to allow the jury to use that strong evidence, to infer *murder*, with only

3  "slight" corroboration did not affect the jury's verdict.

4         Moreover, the instruction given defined "slight corroboration" as only "the attributes of

5  possession, time, place, and manner; that the defendant had an opportunity to commit the crime

6  charged; the defendant's conduct; his false or contradictory statement, if any; and other

7  statements that may have been made with reference to the property." (Resp't Lodgment No. 15

8  at 233.) Thus, the jury could have inferred Sherrors committed the murder based the "time, place

9  and manner" of his possession, that is, on the mere fact that he was seemingly in possession of

10 the Audi in the days after the murder.

11        The jury could also have found its "slight corroboration" in the fact that Sherrors

12 seemingly lied about the ownership of the car.  Thus, finding that Sherrors made "false or

13 contradictory statement.. . regarding the [car].  *See id.*  Emildre Moore stated that she saw

14 Sherrors and Hall get into the car.  She asked them whose car it was, and they replied that it was

15 Lena Hixon's mother's car.  (*Id.* at 894.)  With this simple "corroborative" testimony, under

16 CALJIC No. 2.15, the jury could have inferred that Sherrors was therefore guilty of murder.

17        It is true that the jury was instructed on the required elements of murder, robbery, first

18 degree felony murder based upon a murder committed during the commission of a robbery, and

19 on the special circumstance of murder in the commission of a robbery.[27]  (*See* Resp't Lodgment

20 No. 15 at 260, 263, 276.)  The jurors were also told the elements of each must be proved beyond

21 a reasonable doubt.  (*Id.* at 248, CALJIC No. 2.90.)  However, even with these instructions, there

22 is a serious likelihood that CALJIC No. 2.15 could have lead to juror confusion because of the

23 "multiple deductions needed to rationally make the permissive inference." *See People v. Barker*,

24

25        [26]  Douglas Griffey stated that he saw Hixon getting out of the Audi.  Thus, while there was
26 testimony that Sherrors was in possession of the Audi, there was testimony that Hixon was as well.  (*Id.*
   at 861.)

27        [27] Although, as discussed above, the special circumstance instruction, CALJIC No. 8.81.17, was
28 erroneous, as was the special verdict form for the special circumstance allegation.  (*See* Sections IV
   (B)(5)(a)(1) & IV(B)(5)(b)(1).

1   91 Cal.App. 4th 1166, 1177 (2001).  CALJIC No. 2.15 was also highlighted during closing

2   argument by defense counsel, thus the jurors were specifically directed to it.  (*See* Resp't

3   Lodgment No. 17 at 1818-20.)

4       Similarly, while the jury did find the special circumstance allegation of murder committed

5   in the course of a robbery to be true, this does not necessarily mean that it credited the testimony

6   of Lena Hixon.  Because of the likely confusion caused by the erroneous instruction, this Court

7   cannot say whether the jury's special circumstance determination was part of the "multiple

8   deductions" made as a result of the unconstitutional  inference.  Given this, the court finds the

9   matter is so evenly balanced that it is in "virtual equipoise" as to the harmlessness of the error.

10  *O'Neal*, 513 U.S. at 436, 445.

11      After reviewing the transcripts and all the evidence as a whole, this Court has grave doubt

12  as whether the violation of Sherrors' due process rights had a substantial influence on the

13  conviction.  Thus, under *Brecht v. Abrahamson*, 507 U.S. 619, 637-38, this Court recommends

14  habeas relief as to this claim be **GRANTED.**

15              *(2)     Ineffective Assistance of Counsel*

16      Sherrors argues that trial counsel was ineffective in failing to object to CALJIC No. 2.51.

17  He raised this claim in petition for habeas corpus to the California Supreme Court.  It was denied

18  without comment or citation.  (*See* Lodgment No. 14.)  Thus, this Court must "look through" to

19  the last reasoned state court decision to address the claim, the superior court opinion denying his

20  habeas corpus petition, as the basis of its analysis.  *Ylst*, 501 U.S. at 801-06.

21      In denying this claim the court stated "Both defendants raised this instruction on appeal.

22  The determination by the Court of Appeal that the trial court's error in giving the instruction was

23  not prejudicial, precludes an ineffective assistance of counsel claim on this ground."  (Resp't

24  Lodgment No. 10 at 7.)

25      To show that an attorney's representation of a client was ineffective under *Strickland*, the

26  petitioner must establish that (1) the attorney's representation fell below an objective standard

27  of reasonableness; and (2) the deficient representation prejudiced the defense. 466 U.S. at 687;

28  *Schell v. Witek, 218 F.3d* 1017, 1028 (9th Cir. 2000).

1    Given the above discussion and conclusion that the instruction was a violation of Sherrors'
2 due process rights, it follows that counsel's failure to object to the instruction was unreasonable.
3 It is unclear, however, whether Sherrors was prejudiced by counsel's failure to object because
4 one cannot know whether the trial judge would have given the instruction regardless.  At the time
5 of the trial, the California Supreme Court had not decided *Prieto*, and the law in the superior
6 court's appellate district did not become settled until a year after the trial.[28]  On the other hand,
7 as discussed above there was clearly established Supreme Court law, stating that such a
8 "presumption must be regarded as 'irrational' or 'arbitrary,' and hence unconstitutional, unless
9 it can at least be said with substantial assurance that the presumed fact is more likely than not to
10 flow from the proved fact on which it is made to depend." *Ulster County*, 442 U.S. at166 n.28
11 *quoting Leary v. United States,* 395 U.S. 6, 36 (1969).

12    Because this Court finds Sherrors is entitled to relief as to the substance of his due process
13 claim, this Court need not decide whether, had counsel objected to the instruction, the instruction
14 would have nonetheless been given and Sherrors prejudiced.

15                    *(3)    Conclusion*

16    The Court finds that Sherrors' due process rights were violated when the trial court
17 instructed the jury under CALJIC No. 2.15.  The state court's denial of the claim was an
18 unreasonable application of clearly established law.  Further, this Court finds the error had a
19 substantially injurious affect on the jury's verdict.  Therefore, Sherrors is entitled to relief as to
20 his due process claim.  Accordingly, the Court need not decide whether he was prejudiced by his
21 counsel's failure to object to the instruction.  The Court recommends Sherrors' petition for habeas
22 corpus be **GRANTED** for the above reasons.

23 **IV.    CONCLUSION AND RECOMMENDATION**

24    The Court submits this Report and Recommendation to the Chief Judge of the United
25 States District Irma Gonzalez, under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the

27 _____
28    [28] In 2001, the California Court of Appeal for the Fourth District, Division one decided *People v. Barker*, 91 Cal.App. 4th 1166, 1177 (2001) (holding that it was error to instruct jury under CALJIC No. 2.15 that it could infer murder, upon slight corroboration, if it found the defendant was in conscious possession of stolen property.)

United States District Court for the Southern District of California. For the reasons outlined above, **IT HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered conditionally granting the Petition unless the State decides to retry Petitioner within a reasonable time.

**IT IS ORDERED** that no later than **June 25, 2007,** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **July 9, 2007**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED: May 24, 2007

_____
Hon. Leo S. Papas
U.S. Magistrate Judge

05cv1262